# Richmond

MAYER SMITH v. EDWARD J. FARRELL.

April 26, 1957.

Record No. 4660.

Present, Eggleston, Buchanan, Miller, Whittle and Snead, JJ.

The opinion states the case.

*Lipman Redman* (*Thomas G. Mays, Jr.* and *Adams, Porter & Radigan*, on brief), for the plaintiff in error.

*Anna F. Hedrick* (*Ewell G. Moore, Jr.* and *Hedrick, Fletcher, Moore & Leigh*, on brief), for the defendant in error.

SNEAD, J., delivered the opinion of the court.

Edward J. Farrell, a real estate broker, filed motion for judgment against Mayer Smith for $371,679.03 as damages resulting from a

breach of an oral contract entered into between the parties on June 15, 1954.

He averred in his motion that Smith agreed to construct 1500 houses in a subdivision known as Ada Valley, Anne Arundel County, Maryland, beginning "on or near September 18, 1954, and to be completed within a reasonable time thereafter." He further alleged that he (Farrell) was to expend funds to promote and advertise the subdivision not to exceed ten per cent of commissions earned, which commissions were to be between $250 and $350 for each house sold; that he, pursuant to the agreement, devoted much time and spent $3,320.97 in promoting and advertising the project; that Smith failed to begin construction as agreed, the first house having been completed in January 1955; that Smith completed only three houses; that on January 6, 1955, Smith notified Farrell, without legal justification, that he did not intend to pay him any commission and that his services were terminated, which prevented him from fulfilling his obligations under the contract.

In Smith's answer to the motion for judgment he denied, *inter alia*, the existence of the contract as alleged, and stated that there was no duty imposed upon him by contract or otherwise to construct the houses in question; that the agreement was as set forth in his letter to Farrell, dated November 22, 1954, and that the only contractual relationship was one of agency, uncoupled with an interest, between Wilton Woods Building Corporation, owner of Ada Valley, and Farrell, wherein Farrell could offer for sale houses which might be built and receive commissions in event of sale.

The case proceeded to trial before a jury, and resulted in a verdict of $110,000, which the court refused to set aside and judgment was entered accordingly. An appeal was granted Smith.

The parties will be hereinafter referred to at times as plaintiff and defendant in accordance with their positions in the trial court.

Defendant contends, in his assignments of error, that the verdict is contrary to the law and the evidence; that the trial court erred in refusing to set aside the verdict in that plaintiff had failed to carry the burden of proof and establish the alleged contract, and that plaintiff failed to carry the burden of proof relative to his damages in that the damages shown are too remote, speculative and contingent.

The chief assignment of error requires that the evidence be stated in some detail.

Plaintiff having prevailed in the trial court, we are required to view the evidence in the light most favorable to him.

Plaintiff, a realtor licensed in Virginia, Maryland and District of Columbia, caused to be published in the Washington Post on April 17, 1954, an advertisement addressed to builders and developers, offering for sale several hundred acres of land in Maryland. As a result of the publication defendant contacted plaintiff in reference to purchasing the property. Defendant, through Wilton Woods Building Corporation (hereinafter referred to as corporation) of which he was president, made an agreeable offer for the purchase of land known as the Bussey tract, containing approximately 94 acres, and the agreement was reduced to writing dated May 26, 1954. Later the corporation purchased several other tracts through plaintiff and he received full commissions from the vendors for all properties sold the corporation.

On June 15, 1954, a meeting was held in Farrell's office, at which the oral contract was alleged to have been made that is the basis for this action. Those present, other than the parties to this action, were Joseph E. Monaco, Smith's superintendent, and Jesse Bryant Bettis, Farrell's engineer and salesman.

Plaintiff testified that at this meeting it was agreed that he was to prepare brochures and newspaper advertisements in regard to the proposed development; that he would be in complete charge of sales and the hiring of sales representatives; that his commissions would be $250 for sale of a two bedroom house, $300 for a three bedroom house and $350 for a four bedroom house; that he was to have exclusive sales rights for the first 1500 houses to be built; that he was to expend for promotion sums not to exceed 10% of commissions earned. In support of his contention that defendant agreed at this meeting to build 1500 houses and pay commissions for their sale as stated above, plaintiff when asked on direct examination "What was said, if anything, at that meeting concerning whether or not Mr. Smith was obligated to build the houses, and, if so, how many, and, if so, how many were you to have an exclusive right to sell?", replied as follows: "Mr. Smith explained that as the operation graduated in size that outside investors would be involved and that he could only commit himself to us for 1500 houses that we could sell; that after that point, should our services prove satisfactory, he would then naturally recommend us for further sales but that he couldn't commit himself for over 1500 in Area 1."

He further testified that on June 17, 1954, two days after the meeting, he wrote defendant a letter which is filed as an exhibit, setting forth the commissions agreed upon. It is stated in the first paragraph thereof: "This will confirm our discussion in my office on June 15, 1954 regarding sale commissions payable under an exclusive for all houses constructed in your development projects in ANNE ARUNDEL COUNTY, MARYLAND." Nowhere in the letter is mention made of any promise on defendant's part to build the houses.

He also testified that pursuant to the agreement he employed George J. Nilles for the purpose of promoting sale of the houses to be constructed, who remained in his employ for several months and that his total expenditures in connection with the project amounted to approximately $3,300.

On cross examination plaintiff stated:

"Q. Yes, sir. Now, is it your testimony, also that someone agreed with you, either Mr. Smith or—I mean, he, acting for the corporation, agreed with you that they would build 1500 houses and that they would let you sell 1500 houses?

"A. Oh, definitely not. They were going to build 7500 houses and I was going to get the opportunity to sell the first 1500. The master plan was not for 1500 houses. It was for 7500 houses.

"Q. Insofar as you were concerned?

"A. I had a lien on 1500 when I—

"Q. (Interposing) You had a lien?

"A. When I say that, I'm using a term. In other words, I had an opportunity under contract to sell the first 1500.

  *   *   *   *   *   *   *

"Q. All right, sir. Now, to go back to your agreement—if you would tell me what the terms of the agreement were, the total terms as you understood them when you wrote this letter on June 17.

"A. Were to sell—we were to have the opportunity to sell 1500 houses. After that, it would be a question. then. of whether our performance had been satisfactory or not on the 1500. If it had been satisfactory, we would be considered for additional houses.

"That scale of commission was to be as part of the agreement for the sale of the houses.

"Q. So, actually, what you understood and what you're saying to

me is that you understood that you had exclusive listings to sell 1500 houses?

"A. That's correct."

He also stated that at the time he sold the property to the corporation, he knew that sewer and water facilities were not available and that the county commissioners could not fix a time when they would be available; that only three sample houses had been built at the time of trial of this case; that defendant had indicated to him that his net worth was $35,000 and he could not finance the project alone, but with his brothers and connections he could show a financial statement of one million dollars; that to finance 1500 houses at $10,000 each would require approximately fifteen million dollars; that he was not familiar with F. H. A.'s attitude toward making a determination as to the need for housing in the area where construction was contemplated at the time the alleged agreement was made and was unable to say what its attitude was at the time of trial; that he had "never actually been a part of a development", and that he got started on the project in October or November 1954.

Defendant, as president of the corporation, wrote plaintiff on November 22, 1954, advising that since ground had been recently broken for the subdivision, they should have an understanding as to what part plaintiff was "supposed to play in this undertaking." He related therein that he had a verbal agreement with plaintiff that he was to sell some of the houses about to be constructed in Ada Valley and set forth the rate of commission which rate was in accord with that heretofore stated by plaintiff. He stated that as long as plaintiff's work was satisfactory that arrangement would be kept, but that the corporation and any other corporation chartered to handle this project, or he as president, reserved the right to discontinue this "agreement". Plaintiff made no written reply to the letter, but said that he did reply verbally. When asked if he did not call defendant on the telephone and request that an insertion be made giving 30 to 60 days notice prior to termination of his employment, which request was refused, he replied that he could not recall.

Monaco, defendant's former superintendent, who testified as a witness for plaintiff, stated that he estimated defendant needed a capital of $600,000 to make land purchases and carry on the construction; that when he left defendant's employment only $248,000 had been raised; that he was present in January 1955, when defendant informed plaintiff his services were terminated. On cross examina-

tion he testified that Farrell was to have the exclusive right to sell houses in Area 1; that Smith reserved "the right to terminate that relationship with Mr. Farrell at any time"; that Smith had planned to build between 1500 and 2000 houses in Area 1; that sample houses were to be built; that plaintiff was to have sales for the houses as they were built. In reply to a question propounded by counsel for plaintiff whether anything was said in his presence between plaintiff and defendant as to whether plaintiff would permit the land to be sold unless defendant agreed to build and that plaintiff would get commissions from the sale of the houses, he said "Mr. Farrell stated that he wanted to sell the land to a builder so that—he was interested in getting the resale—the sale of the houses from the builder.

"In other words, he wanted a builder to buy the land so that he could get the re-sale of the houses."

Bettis, a witness for plaintiff, testified as to what plaintiff agreed to do in connection with the project, which is substantially similar to that testified to by plaintiff. He also stated that at the time of the meeting on June 15, 1954 applications had been filed changing the zoning of the property from farm to residential, and there was a question as to the length of time it would take to change the zoning and secure building permits, and that the date to commence construction was set later. On cross examination he was asked, "You wouldn't say to this Court and this jury that under the circumstances, all of the problems that had to be faced, that Mr. Smith either on behalf of himself or on behalf of his corporation, would have guaranteed to you or Mr. Farrell or to anybody that he could and would build 1500 homes, much less 7500 homes on that spot?" He replied that he "assured us that he would." When reminded that the word "guaranteed" was used in the question, he stated "Well, I don't use the word "guarantee". I would say he gave us his word as a gentleman, his word of honor, that he would and was able to go through with the project." When asked whether he thought that defendant bound himself or agreed "actually to build that many houses within a short time after September 1954", he replied "I certainly do." He was then asked whether he based that statement on all the inferences that he had drawn from defendant's acts. His reply was that defendant sold himself to them and sold them "on the idea that he could produce and we believed in him."

Defendant said that during the discussion concerning the purchase of the property, plaintiff informed him that he had been in contact

with the movement officers of National Security Agency and they were planning to construct a very large building in the vicinity of Ada Valley project and that the movement of personnel would be very substantial; that when he purchased the land nothing was said by plaintiff or his representatives to the effect that it was essential that plaintiff have the right to sell the houses to be constructed before it could be purchased, but they knew he was buying for building purposes; that the agreement between the parties was as set forth in his letter to plaintiff, dated November 22, 1954; that plaintiff called him in reference to the letter and requested he be given prior notice in event he saw fit to discontinue his services, which request was refused, and that plaintiff has never told him that he differed with the terms set forth in the letter.

He further testified that the corporation had spent more than $10,000 advertising the project; that the loss on the project exceeded $60,000; that he complained to plaintiff that Nilles, his salesman for the project, had been derelict in the performance of his duty in failing to meet a bus with passengers interested in the project and Nilles was discharged; that he had concluded that plaintiff was not capable of his assignment and on January 6, 1955, advised him that his services were terminated, and this action was confirmed by letter dated January 22, 1955; that there was no guarantee to build 1500 houses within a short time after September, 1954, but it was their intention, if conditions were favorable and there was success in meeting all requirements, to sell and then build at a rapid rate; that he did not "firmly" state to plaintiff that he could raise a million dollars for the project, but did state the accumulated wealth of his family was one million dollars.

Whether the evidence establishes that a reasonably certain, definite and understandable contract was settled upon and entered into between the parties and thereafter breached by defendant is the ultimate question to be determined.

In *Mullins* v. *Mingo Lime, etc., Co.*, 176 Va. 44, 49, 10 S. E. 2d 492, we quoted with approval from Williston, Contracts, Vol. 1, § 37, p. 98, as follows: "It is a necessary requirement in the nature of things that an agreement in order to be binding must be sufficiently definite to enable a court to give it an exact meaning."

In 4 M. J., Contracts § 27, p. 359, it is said: "Another essential element of a valid contract is certainty and completeness. The element of completeness denotes that the contract embraces all the material

terms; that of certainty denotes that each one of those terms is expressed in a sufficiently exact and definite manner. An incomplete contract, therefore, is one from which one or more material terms have been entirely omitted. An uncertain contract is one which may, indeed, embrace all the material terms, but one of them is expressed in so inexact, indefinite or obscure language that the intent of the parties cannot be sufficiently ascertained to enable the court to carry it into effect.

"While a contract to be valid and enforceable must be so certain that each party may have an action upon it, reasonable certainty is all that is required. So where a contract is to some extent uncertain and ambiguous, it may be read in the light of surrounding circumstances, and if, reading it thus, its meaning may be gathered, the same will be enforced. But an agreement, in order to be binding, must be sufficiently definite to enable a court to give it an exact meaning, and must obligate the contracting parties to matters definitely ascertained or ascertainable."

In 17 C. J. S., Contracts, § 31, p. 359, the principle is stated thus:

"In order that there may be an agreement, the parties must have a distinct intention common to both and without doubt or difference. Until all understand alike, there can be no assent, and, therefore, no contract. Both parties must assent to the same thing in the same sense, and their minds must meet as to all the terms. If any portion of the proposed terms is not settled, or no mode is agreed on by which it may be settled, there is no agreement, * * *." *Weill* v. *Brown*, 197 Ga. 328, 332, 29 S. E. 2d 54; *Denton* v. *Etheridge*, 73 Ga. App. 221, 36 S. E. 2d 365; *Moran* v. *Hammersla*, 188 Md. 378, 52 A. 2d 727.

This is not a situation where the houses were built and sold by one or more persons other than plaintiff. Only three sample houses were constructed, and they lacked the essential utilities. No sales commissions were paid to anyone. On June 15, 1954, the time the alleged contract was made, adequate capital was not in hand; arrangements had not been made for water and sewer service; rezoning of the property had not been accomplished, and there was no assurance that F. H. A. or Veteran's Administration financing, involving millions of dollars, could be obtained. In view of these circumstances, plaintiff maintains that defendant unconditionally agreed to construct 1500 houses in Area 1. Unquestionably, defendant was hopeful and believed that the project could be made a success and plaintiff was likewise of the same opinion, yet the many major problems which had

to be overcome were not solved and might never be and both parties were aware of these facts. It is another of those unfortunate cases where all were hopeful, but the ship failed to reach port.

The evidence offered in support of the alleged contract is indefinite, vague and inconclusive. Though all conflicts and just inferences be resolved in favor of plaintiff, grave uncertainty remains as to the intention of the parties. A fair analysis of the entire evidence does not disclose that defendant unconditionally committed himself to build houses though it does substantiate the fact that plaintiff was to have the exclusive listing to sell 1500 houses in Area 1, *if built*. Clearly, this is not sufficient to sustain a finding that defendant unconditionally bound himself to build the 1500 houses or any definite number and, therefore, plaintiff is not entitled to any commissions or damages.

Having concluded that there was no binding agreement on defendant to construct the houses in Ada Valley, it is unnecessary to discuss the assignment of error as to damages.

The judgment of the trial court is reversed and final judgment will be entered for defendant.

*Reversed and final judgment.*