## CIRCUIT COURT OF THE CITY OF NORFOLK

Frank Wayne Avery et al.

v.

City of Norfolk

April 17, 2003

Case No. (Chancery) CH03-145

BY JUDGE CHARLES E. POSTON

This suit for declaratory judgment and an injunction was tried to the Court on January 22, 2003. Following the trial, counsel for the parties submitted proposed Findings of Fact and Conclusions of Law. For the reasons explained below, the Court finds for the Defendant and dismisses this cause with prejudice.

### Findings of Fact

The Plaintiffs in this cause are some fifty-three active or retired firefighters or police officers, all of whom were employed by the City of Norfolk prior to 1970. The Defendant City of Norfolk is a municipal corporation organized and existing under the laws of the Commonwealth of Virginia. The Norfolk City Council establishes the compensation and retirement benefits for the policemen and firemen through ordinances that it adopts from time to time.

In late 1969 and throughout the first half of 1970, the Fraternal Order of Police and the Firemen's Association led a campaign for increased compensation and improved retirement benefits. Members of the Police and Fire Departments, acting primarily through the officers of these organizations,

made specific written requests for improvements in their overall compensation packages to the City Council.

The Plaintiffs and others during these months brought to the City Council's attention a serious disparity in pay between Norfolk police officers and firefighters and those employed by other comparable Virginia municipalities. They had two legitimate concerns. First, they desired improvement in their own present financial situations as well as in their retirement programs. Second, they were concerned that a failure to remedy the disparity in pay and retirement benefits could lead to a public safety crisis through the loss of qualified police officers and firefighters to other higher-paying jurisdictions. Indeed, some of these City employees did accept employment elsewhere.

In their attempt to educate the City Council about the problem, the police officers and firefighters made specific written requests of the City Council. They also took their campaign to the citizenry by soliciting signatures to petitions addressed to the City Council that expressed support for improved compensation benefits for police officers and firefighters. Throughout this campaign for enhanced compensation benefits and at all times germane to this cause, the police officers and firefighters knew that any of the improvements they sought could be realized only through the valid adoption of an ordinance by the City Council. They also knew that the City Manager could not bind the City Council with respect to these issues.

Through Ordinance Number 25,493 adopted May 26, 1970, the City Council appropriated $749,304 for pay adjustments "or" pension improvements for the firefighters and police officers. By letter to City Manager Thomas F. Maxwell dated May 1, 1970, Fred W. Enos, President of the Fraternal Order of Police, and Charles L. Mason, President of the Norfolk Firemen's Association, requested that the appropriated funds be used for improvements to the retirement plan rather than for a pay raise. They specifically requested that the accrual period for benefits be "limited to a maximum of 34 years."

The City Manager responded by letter on May 11, 1970, and advised Enos and Mason to appear at a budget hearing on May 15, 1970, and to present a proposal for the Council's consideration. He recommended that they ask the City Council to direct that the City Manager advise each police officer and firefighter of the proposal and to give each an opportunity to state a preference between improved retirement benefits or a salary increase. Significantly, the City Manager wrote: "As you know, my budget message to the City Council represents a proposal, and does not in any way commit the

Council to accept such proposal." (Def.'s Ex. 4.) This proposed "polling" of those affected was, in the City Manager's words:

> [T]he only method that I know of that could be pursued at this late date to properly determine [*sic*] the desires of the majority of the policemen and firemen is the matter of a choice between a pay raise and retirement improvements that could be financial in the amount of money equivalent to the cost of the recommended pay raise.

(Pls.'s Ex. 2.)

In August 1970, the police officers and firefighters had the opportunity to express their preference between a salary increase and enhanced retirement benefits. Each of them received a letter from the City Manager dated July 16, 1970, outlining all the provisions upon which they could express a preference, including the caveat that creditable service be "not in excess of 34 such years." The letter continued: "Again it should be emphasized that this balloting is merely for the purpose of informing the Council as to the preferences of the employees, and is in no way binding upon the City Council." (Def.'s Ex. 6.) A total of 892 ballots were cast, of which 796 expressed a preference for enhanced retirement benefits. (Def.'s Ex. 11.)

On August 25, 1970, the City Manager recommended that the Council provide for enhanced retirement benefits as endorsed by the balloting. This balloting was accepted by the City Manager and the City Council as an accurate expression of the views of the affected employees. The enhanced retirement system originally sought by the Plaintiffs included three principal components:

1. Retirement after 25 years of service, regardless of age;

2. Fully funded by the City, requiring no contributions by the employees; and,

3. A two percent a year credit for entire time of service without intervention of a cap.

(Test. of D. Emerson, Tr. at 52; Test. of R. L. Bagwell, Tr. at 104.) The Plaintiffs believed that these enhanced retirement benefits were to be financed with the funds that would have been allocated for a 9.4% pay raise. (Pls.'s Ex. 2 and 3.)

In January 1971, the City Council adopted Ordinance No. 25,803 relating to the retirement plan for police officers and firefighters. This ordinance included a cap of 34 years of creditable service. (Def.'s Ex. 7.) None of the named Plaintiffs participated in negotiations with the City

concerning the retirement plan; their knowledge is based on reports they received from others. (Tr. at 93, 108, and 115.) Indeed, until trial, the named claimants were unaware that the 1971 ordinance contained a cap on benefits. (Tr. at 69, 97, 104, and 116.) Nevertheless, by Ordinance No. 26,402, effective July 1, 1972, the City Council eliminated the cap for police officers and firefighters.

The evidence does not reveal any communications between the affected employees and the City regarding the 1972 amendments, and whether those amendments related to the 1970 balloting is a matter of speculation. The 1972 amendments did, however, eliminate the cap imposed in 1971.

A quarter of a century later, the City Council again amended the retirement plan for police officers and firefighters through Ordinance No. 38,389, adopted May 21, 1996, to be effective January 1, 1997. The ordinance limited the maximum accrual of creditable service for benefits to 65% of average final compensation. This cap translates to about 322 years of service. When this change was made, none of the named Plaintiffs had worked for more than 34 years, the "cap" originally imposed.

The Plaintiffs assert that adoption of the 1996 Ordinance breached an agreement created "in 1970 which resulted in the retirement Ordinance of 1972, which Ordinance contained the retirement provisions sought by the plaintiffs in connection with the forbearance of a sizeable raise." (Pls.'s Proposed Findings of Fact and Conclusions of Law, ¶ I(B)(1).) Nevertheless, there is no evidence that any such agreement was approved in writing or in any other manner by the City Attorney nor is there evidence that the Director of Finance ever certified that the funds required by the alleged agreement were in the city treasury. While the City Manager clearly participated in discussion with members of the police and fire departments, there is no evidence that he even executed any agreement. No writing memorializing the alleged agreement was executed and sealed with the City's corporate seal with the attestation of the City Clerk.

There is no doubt that the retirement plan created by the City in 1971 included significantly enhanced benefits for police officers and firefighters.

*The Law*

The Plaintiffs allege the existence of an express contract with the City. Because they bear the burden of proof, they must prove by the greater weight of the evidence the existence of a contract, the terms of the contract, and a meeting of the parties' minds "on every material phase of the alleged agreement." *Chittum v. Potter*, 216 Va. 463, 467 (1975) ("It is crucial to a

determination that a contract exists, however, that the minds of the parties have met on every material phase of the alleged agreement.").

Alternatively, the Plaintiffs urge that, even if they fail to prove the existence of a contract, they can recover because the City has abrogated a substantive right. They argue, in their proposed conclusions of law that:

> As to this theory of recovery [*i.e.*, abrogation of a substantive right], the existence or not of a classic identifiable contract is not dispositive of the plaintiffs' claims, since the plaintiffs have also alleged the existence of a substantive right, to wit, the enforcement of the employee retirement benefit package encased in the City ordinance adopted effective July 1, 1972, which included no cap.

(Pls. Proposed Findings of Fact and Conclusions of Law, ¶ II(B)(2).)

The Court will address each of these theories of the recovery separately.

### The Contract Theory

Blackstone defined a contract as an agreement between competent parties, upon a consideration sufficient in law, "to do or not to do a particular thing." 2 W. Blackstone, *Commentaries* 442. A more modern definition expresses Blackstone's definition as follows: "A contract may be defined as an agreement between competent parties supported by a legal consideration and in the form prescribed by law, creating an obligation on the part of one or both to do or refrain from doing some lawful thing." Michie's Jurisprudence, *Contracts*, § 2 (2002). The terms of a contract, if enforceable, must be "sufficiently definite to enable a court to give it an exact meaning," *Smith v. Farrell*, 199 Va. 121, 127 (1957) (citations omitted); and, the agreement is binding only if it is "definite and certain as to its terms and requirements." *Progressive Const. Co. v. Thurman*, 209 Va. 24, 30-31 (1988). Such an agreement "must identify the subject matter and spell out the essential commitments and agreements with respect thereto." *Id.*

Of course, the first step in forming a contract is the extending of an offer. If no offer is extended, no agreement is possible. The Virginia Supreme Court, in adopting the definition of "offer" found in the *Restatement (Second) of Contracts* § 24, explained that "[a]n offer, which is usually but not always a promise, is a manifestation of a willingness to enter into a bargain." *Chang v. First Colonial Savings Bank*, 242 Va. 388, 392 (1991). The Court further

stated that "[t]he offer identifies the bargained for exchange and creates a power of acceptance in the offeree." *Id.*

The Court finds that no offer was made by the City in the case at bar. Throughout the negotiations between the City Manager and the Plaintiffs' representation, the City Manager expressly advised that he could not bind the City Council. He also took pains to advise each police officer and firefighter that the "referendum" on the issue was advisory only and could not bind the City Council. The evidence also shows that the City Council was not involved in the negotiations with the Plaintiffs. Contract law requires mutuality of obligation "so that each party has the right to hold the other to a positive agreement. Both parties must be bound, or neither is bound." *Capps v. Capps*, 216 Va. 378, 381 (1975). Because the City Manager lacked the authority to bind the City Council, any ideas extended to the Plaintiffs did not constitute offers to enter into any agreement with the City Council. The City Council was not bound by these "offers;" therefore, the Plaintiffs' "acceptance" could not have formed a valid contract with the Council.

Even if it be determined that the City Manager extended an offer which was accepted, there could be no binding contract. The City Charter is very specific in its prescription for any contract entered into by the City:

1. It must be in writing. Charter of the City of Norfolk, § 53.

2. It must be revised by the City Attorney who must certify that he approves it as to the form and correctness thereof. *Id.* at § 53.

3. The Director of Finance must certify that funds required by the contract are in the city treasury. *Id.* at § 72.

4. The City Manager or other official authorized by the City Ordinance must execute all contracts made by the City. *Id.* at § 50(g); Norfolk Code of Ordinances § 2-7.

5. It must be signed and sealed with the corporate seal of the City and attested by the City Clerk. Norfolk Code of Ordinances, § 2-7.

All of these requirements are mandatory; they cannot be waived by the City. Not one of the foregoing requirements specified in the City Charter were met with respect to the alleged contract.

By the Plaintiffs' admission in the pleadings, the alleged agreement was negotiated on their behalf by the officers of the Fraternal Order of Police and the Norfolk Firemen's Association. The City urges that the alleged agreement could not have been made — and is void if it were made — because it would have been the result of collective bargaining.

The Virginia Supreme Court has adopted the following definition of "collective bargaining":

*Collective bargaining.* The process by which an employer bargains with his employees *collectively* regarding wages, hours, and working conditions, instead of *individually* at the time each individual employee is hired. This is done through the selection by the employees of an employee representative. . . . Such an employee representative, having been selected by a majority of the employees in an appropriate unit, then speaks with the employer regarding wages, hours, and working conditions in that unit and the two sides bargain with a view to reaching an agreement on those matters for that unit.

*Commonwealth v. County Board of Arlington*, 217 Va. 558, 572 (1977). The method by which the Plaintiffs reached the alleged agreement was collective bargaining. Collective bargaining by city employees is not permitted in Virginia. Any contract between the city and its employees reached through collective bargaining is void. *Id.* at 581.

For these reasons, the Court concludes that no contract exists, or ever existed, as alleged by the Plaintiffs. Further, the Court holds that any contract created as alleged would be void because it, of necessity, would have been reached through the process of collective bargaining.

### The Substantive Right Theory

Even without a contract, the Plaintiffs say they should prevail because the City modified a substantive right to their detriment. In support of their position, the Plaintiffs rely primarily on Virginia Code, § 1-16:

No new law shall be construed to repeal a former law, as to any offense committed against the former law, or as to any act done, any penalty, forfeiture, or punishment incurred, *or any right accrued, or claim arising under the former law*, or in any way whatever to affect any such offense or act so committed or done, or any penalty, forfeiture, or punishment so incurred, or any right accrued, or claim arising before the new law takes effect; save only that the proceedings thereafter had shall conform, so far as practicable, to the laws in force at the time of such proceedings; and if any penalty, forfeiture, or punishment be mitigated by any provision of the new law, such provision may, with the consent of the party affected, be applied to any judgment pronounced after the new law takes effect.

Va. Code Ann. § 1-16 (Michie 2003) (emphasis added). This statute expresses the law that has been in effect in Virginia for more than a century, and it encompass both civil and criminal cases. *Garraghty v. Virginia Dept. of Corrections*, 52 F.3d 1274, 1281 (4th Cir. 1995); *Mosby v. St. Louis Mutual Ins. Co.*, 72 Va. (31 Gratt.) 629, 634 (1879). The statute has been applied on several occasions in civil cases involving employment disputes. In 1989, the Virginia Supreme Court, consistent with its position expressed as early as 1879, stated that it was unwilling to agree to a rule that would permit the destruction of *vested or substantive* rights by retroactive application of legislation. *Lake of the Woods Assn. v. McHugh*, 238 Va. 1, 9 (1989).

In this case, the Plaintiffs place great reliance on *City of Norfolk v. Kohler*, 234 Va. 341 (1987). In *Kohler*, Betty Kohler accepted the city's offer of employment as a librarian, a position in the city's classified civil service. *Id.* at 342. The city charter at the time conferred certain job guarantees to classified employees. Among those guarantees were the protection of due process, security of not being discharged without just cause, and the right to work until she retired. *Id.* at 343. Some years later, the city notified Kohler by letter that she was terminated. *Id.* The city never gave her the reasons for her discharge, and she was denied the opportunity to be heard before or after her firing. *Id.* The Virginia Supreme Court reaffirmed the holding that Code § 1-16 protected both substantive and vested rights. *Id.* at 345. Considering the package of job guarantees granted by the city charter, the Court ruled: "Construing these guarantees together, we hold that they created a substantive right, and in the language of Code § 1-16, a 'right accrued . . . under the former law' which could not be repealed or 'in any way whatever' affected by the enactment of the new law." *Kohler*, 234 Va. at 345.

There are, of course, significant differences between the Plaintiffs and Betty Kohler. Kohler negotiated her own employment agreement, and her employment rights existed under the city charter at the time her employment commenced. *Id.* The Plaintiffs have not been denied a retirement program. Indeed, the retirement program extant when their several employments commenced was substantially inferior to the plan until the 1996 amendments.

The Virginia Supreme Court has stated that:

> The better reasoned decisions proceed on the theory that a noncontributory plan like this is *in the nature of a unilateral contract*. The company makes an offer to its salaried employees in the form of a promise to pay benefits upon the fulfillment of certain conditions by them or upon the happening of certain

events, such as retirement after a specified term of service or sustaining a permanent disability. *Full performance by the employee constitutes acceptance of the offer, and his previously inchoate rights to receive payments under the plan vest and become legally enforceable.*

*Pitts v. City of Richmond*, 235 Va. 16, 19-20 (1988) (quoting *Nicely v. Bank of Virginia Trust Co.*, 221 Va. 1084 (1981)) (emphasis added). Although the Court was discussing retirement benefits provided by a private employer, the Court later used this reasoning in a case dealing with city employees. *See id.* In *Pitts v. City of Richmond*, 235 Va. 16 (1988), the Court determined the death benefits under the City of Richmond's retirement system to which the widows of two firefighters were entitled. *Id.* at 18. The ordinances regulating such compensation changed over the course of the firefighters' employment with the city. *Id.* at 18-19. The widows contended "that they [were] entitled to benefits allowable under any chapter in effect during any period of their husbands' membership in the System, even though such chapter may have been modified or repealed by a later chapter." *Id.* at 19. The city argued "although a retirement system may have some characteristics of a unilateral contract, neither [husband] accepted the contract by performance of all the conditions precedent." *Id.* The Court analogized *Pitts* to *Nicely*, stating that "[a]s in *Nicely*, the retirement plan established by the City Council contains a promise to pay benefits upon the happening of certain events and the performance of all conditions precedent." *Id.* at 20. The Court further explained that:

> Prior to acceptance by full performance, an employee has no vested rights in the System, and the City is free to modify its provisions. In terms of the present cases, the System specifically provides otherwise, neither [widow] can lay a claim to benefits through ordinances no longer in effect at the time their husbands satisfied all prerequisites to payment under the System.

*Id.*

The case at bar is analogous to *Pitts*. In this case, the Plaintiffs alleged that they should be covered by the 1972 ordinance. However, Ordinance No. 38,389, adopted May 21, 1996, to be effective January 1, 1997, amended the 1972 ordinance by limiting the maximum accrual of creditable service for benefits to 65% of average final compensation. Those employees who failed to retire with 25 years of service before January 1, 1997, may not recover

retirement benefits under the 1972 ordinance. Employees may only receive retirement benefits under the retirement system applicable at the time they fully performed all conditions precedent. Their rights to certain retirement benefits vest only after they have performed all requirements completely.

Assuming *arguendo* that a retirement benefit is a substantial or vested right of employment for the Plaintiffs, the question presented, in essence, is whether that benefit can be modified by the City. The Court can find no cases directly bearing on this question.

All of the cases based on Code § 1-16 concerning employment involve allegations of wrongful termination and provide little guidance on changes to specific benefits of employment. The view that employment rights "are position-specific, not person-specific, just as is job description, salary, and all other incidents of employment" appears to be a logical, accurate conclusion. *Grove v. Powell-Woodson*, 35 Va. Cir. 502, 503 (Richmond City, 1991) (Markow, J.). Nothing in the record informs the Court whether the Plaintiffs held the same position throughout their terms of employment. Indeed, it is almost certain that some have been promoted or otherwise moved to positions other than those held initially.

A retirement program is only one employment benefit. Hospitalization insurance, for example, is another. The fact that the hospitalization insurance program for city employees has changed over the years is so certain as to be almost susceptible to judicial notice. Is the City obligated to maintain the same benefits in this program? Must the City insure that its employees are covered by the same insurer? Must the city ignore the economy and the circumstances of the marketplace in managing its employee benefit programs? Clearly such requirements would be devoid of logic and, further, inimical to the best interests of the citizens as a whole. The Court holds that the City, in the exercise of reasonable, sound discretion may modify employment benefit programs from time to time so long as it does not do so for punitive purposes.

The Plaintiffs' cause will be dismissed with prejudice, and the City shall be entitled to the costs on its behalf expended.