COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Decker, Judges Malveaux and Causey
Argued at Richmond, Virginia


SANDEEP YADAV, ET AL.

MEMORANDUM OPINION[*] BY
v.      Record No. 0698-22-2      JUDGE MARY BENNETT MALVEAUX
                                  OCTOBER 31, 2023

RAJEEVA AGRAWAL, ET AL.


FROM THE CIRCUIT COURT OF HANOVER COUNTY
J. Overton Harris, Judge

Michael L. Donner, Sr. (Peter E. Schurig; Setliff Law, P.C., on
briefs), for appellants.

Charles M. Sims (Rachael L. Loughlin; O'Hagan Meyer, PLLC, on
brief), for appellees.


Sandeep Yadav and 3T Federal Solutions, LLC (collectively, "Yadav") appeal from a

declaratory judgment of the circuit court in which the court found that Rajeeva Agrawal and

Poonam Agarwal ("the Agrawals") had the necessary voting power under an operating agreement to

execute a written consent removing Yadav as manager of 3T Federal Solutions, LLC ("3T

Federal").  On appeal, Yadav argues that the circuit court erred in: (1) ruling that the Agrawals had

the necessary voting power to remove him as manager of 3T Federal; (2) focusing solely on Section

2.4 of the operating agreement to support its conclusion that voting was to be in proportion to

contribution; (3) failing to consider extrinsic evidence to determine the meaning of terms in the

operating agreement related to voting; and (4) failing to treat the designated agreed value of the

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

contributions in the January 2009 operating agreement as the actual amount of contributions made by the members. For the following reasons, we affirm the circuit court's ruling.

## I. BACKGROUND

In 2001, husband and wife Rajeeva and Poonam Agarwal founded 3P Software Solutions, which became 3T Federal. Sandeep Yadav became a member in 2005. At the time he joined the company, Yadav was a service-disabled veteran. By the end of 2008, 3T Federal had two members, Rajeeva Agrawal, who held a 49% membership interest in the company, and Yadav, who held a 51% membership interest. The parties testified that Yadav was given a 51% membership interest to allow 3T Federal to bid on federal set-aside contracts for veterans.

Prior to 2009, 3T Federal did not have a written operating agreement, and each member's vote counted equally. Later, Rajeeva gave Poonam half of his membership interest. The Agarwals testified that Rajeeva did so because they had more financial risk in 3T Federal and wanted to have two votes while Yadav had one.

In January 2009, the members entered into a written operating agreement which specified that 3T Federal was organized as a Virginia limited liability company ("LLC").[1] The operating agreement also provided that the company was member-managed by all three members.[2] Section 2.1 of the operating agreement required that the "[m]embers initially shall contribute to the Company capital as described in Exhibit 3 attached to this Agreement." Exhibit 3 of the agreement provided that the members' initial contribution to 3T Federal's capital was "stated to be $200,000," with Yadav contributing $102,000 and the Agrawals each contributing $49,000. Yet, at the time of the execution of the agreement, the members did not make the capital

---

[1] In Virginia, an LLC is formed by filing articles of organization with the State Corporation Commission. *See* Code § 13.1-1010. 3T Federal's articles of organization are not a part of the record.

[2] LLCs can be member-managed or manager-managed. *See* Code § 13.1-1022(A).

contributions stated in Exhibit 3. Likewise, from 2009 through 2019, the members made no capital contributions to the LLC.

In 2011, the members sought 3T Federal's certification by the United States Department of Veterans Affairs ("VA") as a service-disabled, veteran-owned small business ("SDVOSB"). To obtain SDVOSB certification, a service-disabled veteran must own 51% or more of a company. *See Veterans Contracting Grp., Inc. v. United States*, 135 Fed. Cl. 610, 613 (2017) ("To qualify for . . . certification as an SDVOSB, '[a] small business concern must be *unconditionally owned* and controlled by one or more eligible . . . service-disabled veterans.'" (alteration in original) (quoting 38 C.F.R. 74.2(a))). The members also sought Section 8(a) certification by the United States Small Business Administration ("SBA") for 3T Federal. To qualify for certification, SBA's Section 8(a) program requires a company to be majority-owned by a person defined as disadvantaged by the agency.[3] *See Desa Grp., Inc. v. U.S. SBA*, 190 F. Supp. 3d 61, 63 (D.D.C. 2016) ("To be eligible for the Section 8(a) program, a business must be 'unconditionally owned and controlled by one or more socially and economically disadvantaged individuals.'" (quoting 13 C.F.R. § 124.101)). 3T Federal retained an outside consultant to assist the certification process for both programs.

Based on the consultant's advice, the members modified the January 2009 operating agreement by agreement dated December 1, 2011, appointing Yadav as 3T Federal's manager "for the duration of the 8a term." The members then entered into a subsequent December 19, 2011 operating agreement which provided that "all matters shall be decided by Fifty One Percent vote of the interests held by Members present in person or by proxy and confirmed by another initial member having at least 24.50% interest." Rajeeva testified that he required the inclusion

---

[3] The parties do not dispute that Yadav was the individual upon whom 3T Federal's eligibility for the program was based.

of this specific provision before signing the agreement to ensure that Yadav would have to consult him or Poonam prior to Yadav making decisions for the company.

In May 2012, Yadav received a letter from the VA informing him that 3T Federal did not qualify as a SDVOSB because he, the service-disabled veteran, did "not have full control over all decisions" under the parties' operating agreement. 3T Federal submitted a request for reconsideration by the VA. Around the same time, the members learned that the SBA had denied Section 8(a) certification for 3T Federal.

The members then entered into another amended operating agreement in June 2012. Rajeeva testified that they entered into this agreement due to the SBA's rejection of their application for Section 8(a) certification. The June 2012 operating agreement provided in Section 2.4 that voting would be "in accordance with the percentage of ownership interest in the Company of each Member," and "all matters shall be decided by Fifty One Percent vote of the interests held by Members . . . except the election or removal of a Manager, which shall require the affirmative consent of the Member upon whom eligibility to participate in the SBA's 8(a) program is based."

Rajeeva testified that after the execution of the June 2012 operating agreement he told Yadav that he was uncomfortable with the agreement because he did not feel that it gave him an adequate say in management decisions. Yadav asked Rajeeva to wait to amend the agreement until after they received a response to their SDVOSB certification.

On September 17, 2012, the VA sent Yadav another letter, informing him that under the amended operating agreement 3T Federal still did not meet the requirements for SDVOSB certification. One day later, Steve Koprince, an attorney, reviewed the VA's denial letter and drafted 3T Federal's request for reconsideration. In an email to Yadav, Koprince stated that in reviewing the June 2012 operating agreement, regarding the prior language of Section 2,

> I read this section as allowing any Member to call a vote, with no quorum required, and stating that a majority of those present would decide the outcome of the vote. In other words, as I read it, the operating agreement would allow a minority member to call a meeting, be the only one to attend, and make company policy by a unanimous vote. I am sure this was not what was intended, but it could impact your eligibility if the CVE (or SBA) were to read it the same way. To that end, I changed Section 2.4(c) to provide that a quorum exists only when at least 51% of Members are present. In other words, your presence is required for a valid meeting. I cleaned up other portions of 2.4(c) and (d) to correspond with this change.

After consulting Koprince, the members entered into another operating agreement dated September 19, 2012. The September 2012 operating agreement did not include the provisions from the June 2012 operating agreement that the members shall vote "in accordance with the percentage of ownership interest in the Company of each Member" and that "all matters shall be decided by Fifty One Percent vote of the interests held by Members." Instead, the September 2012 operating agreement provided in Section 2.4 that "all matters shall be decided by majority vote." Yadav testified that these changes were made to guarantee that 3T Federal would obtain SDVOSB status. Rajeeva testified that when Yadav approached him with the September 2012 operating agreement, Yadav noted that under the agreement "all matters should be decided by the majority vote." According to Rajeeva, Yadav explained to him that this meant that the Agrawals would have a majority vote while Yadav would have 51% of the membership interest and manage the daily operations of the company.

3T Federal obtained Section 8(a) status in August 2012. In January 2013, the company was certified by the VA as a SDVOSB. At trial, Yadav introduced VA forms signed by the Agrawals indicating that "at least 51% of [3T Federal] is owned and controlled . . . by veterans or service-disabled veterans" and correspondence from the VA explaining that 3T Federal did not qualify as a SDVOSB because Yadav, the service-disabled veteran, did "not have full control over all decisions" under the parties' prior operating agreement.

- 5 -

In 2019, the business relationship between Rajeeva and Yadav became strained. On August 26, 2019, Yadav, acting as manager of 3T Federal, terminated the Agrawals' employment with the company. Afterward, the Agrawals signed a written consent, dated October 21, 2019, removing Yadav as the manager of 3T Federal. Yadav refused to comply with the written consent and continued to act as the company's manager.

The Agrawals filed a complaint for declaratory judgment, asking the circuit court to hold that under the written consent they had executed, they had the voting power to remove Yadav as 3T Federal's manager.[4]

At trial, the Agrawals argued that they had the necessary votes to remove Yadav as manager because Code § 13.1-1022, the statutory default provision governing LLC voting, applied; thus, each member's vote was measured in proportion to the member's contributions to 3T Federal. Yadav argued that the Agrawals lacked the power to remove him as manager because the operating agreement provided, and the extrinsic evidence showed, that the members' voting power was to be calculated in proportion to the member's membership interest.

After conducting a two-day bench trial, the circuit court entered an order granting declaratory judgment for the Agrawals. Relying on *Ott v. Monroe*, 282 Va. 403 (2011), *superseded by statute on other grounds*, 2013 Acts, ch. 772, the court held that the default rule of voting by contribution applied to the September 2012 operating agreement because the agreement did not contain language stating an intent to supersede Code § 13.1-1022(B). The court then found that because the members had made no contributions to the company, their contributions to the company had been waived, and thus each member had equal voting power. The court concluded that because each member had "1/3 of the voting power, in accordance with

---

[4] Yadav filed a demurrer to the Agrawals' complaint, asking the circuit court to dismiss the action, which the court overruled. Both parties filed motions for summary judgment, which the court also denied.

their contributions, a vote by two members constitutes a majority vote." The court held that the Agrawals had the necessary voting power to remove Yadav as 3T Federal's manager when they signed the written consent.

In addition to these determinations, the court also evaluated the parties' parol evidence. The court noted that the June 2012 operating agreement stated that "at all meetings of the members, all matters shall be decided by Fifty One Percent vote of the interests held by Members" and that this language was removed in the September 2012 operating agreement, "showing an intent to revert back to the default rules." The court also noted Yadav's argument that the members knew that he must have the ability to fully control all decisions of 3T Federal when they signed the VA forms under the regulations contained in the Code of Federal Regulations ("C.F.R."), but the court found that the "[m]embers' knowledge of the CFR rules [was] not compelling in this case."

This appeal followed.

## II. ANALYSIS

### A. <u>Agrawals' Voting Power</u>

Yadav argues that the circuit court erred in ruling that the Agrawals had the necessary voting power to execute a valid written consent to remove him as manager of 3T Federal.

Because "[t]his appeal assigns error to the circuit court's interpretation of the [operating] [a]greement and the relevant statutes . . . we review the judgment *de novo*." *Ott*, 282 Va. at 407; *see also Remora Investments, L.L.C. v. Orr*, 277 Va. 316, 321 (2009) (noting that an appellate court "has the same opportunity as the trial court to read and interpret the operating agreement of [an] L.L.C.").

In Virginia, LLCs are business entities organized under the Virginia Limited Liability Company Act ("the Act"), Code §§ 13.1-1000 through -1087. A "membership interest" is

defined as "a member's share of the profits and the losses of the limited liability company and the right to receive distributions of the limited liability company's assets." Code § 13.1-1002. The term "contribution" has a separate meaning, and is defined as "any cash, property or services rendered, or a promissory note or other binding obligation to contribute cash or property or to perform services, which a member contributes to a limited liability company in his capacity as a member." *Id.* Further, the Act's default rule on voting is set forth in Code § 13.1-1022(B), which provides that

> [u]nless otherwise provided . . . in an operating agreement, the members of a limited liability company shall vote in proportion to their contributions to the limited liability company, as adjusted from time to time, and a majority vote of the members of a limited liability company shall consist of the vote or other approval of members having a majority share of the voting power of all members.

The issue before the circuit court was whether, under the September 2012 operating agreement, 3T Federal's members vote in proportion to their membership interest, as asserted by Yadav, or in accordance with the Act's default rule, in proportion to their contributions to the company, as asserted by the Agrawals. The court held that the default voting provisions found in Code § 13.1-1022(B) applied to the September 2012 operating agreement because the operating agreement did not contain language stating an intent to supersede the statute, relying on *Ott*. In *Ott*, a daughter of a member of an LLC brought a declaratory judgment action seeking determination that she had inherited her father's full membership, including voting rights, upon his death under the terms of his will. 282 Va. at 406-07. The operating agreement expressly permitted transfer of membership by will or intestate succession. *Id.* at 406. But our Supreme Court ruled that because the agreement did not expressly prevent statutory dissociation upon death under Code § 13.1-1040.1, the code section providing the dissociation default rule, the member's dissociation precluded a transfer of voting rights. *Id.* at 410. The Court held that

because the operating agreement did not "address statutory dissociation" and also did not "state an intent to supersede Code § 13.1-1040.1(7)(a)," the agreement "lack[ed] specific language that would constitute an exception to the rule of dissociation set forth in Code § 13.1-1040.1."[5] *Id.*

The circuit court held that *Ott* applied to the case at hand, noting that "[a]bsent express language to supersede the statu[t]e the Court must find that the Members intended to use the default rules and vote in proportion to their contributions." Therefore, under *Ott*, if the operating agreement is silent on the provision governed by the default statute, the statute controls.

However, the question here is slightly different than *Ott* because the operating agreement is not entirely silent as to voting provisions. The September 2012 operating agreement discusses voting in two separate sections. In Section 2.4(d), the agreement provides that "[a]t all meetings of the Members, all matters shall be decided by *majority vote*."[6] (Emphasis added). Then, in Section 3.1, the agreement specifically addresses the appointment and removal of managers. The agreement provides in that section that "management of the Company shall be vested in one Manager, appointed by that person upon whom eligibility to participate in the SBA's 8(a) program is based," but also provides that a "Manager may be removed and a successor appointed by *a vote of the Members*." (Emphasis added). Neither "majority vote" nor "vote of the

---

[5] *Ott* was superseded by statute on other grounds. The Court also held that even if the agreement had effectively prevented statutory dissociation, "it is not possible for a member unilaterally to alienate this personal control interest in a limited liability company." *Ott*, 282 Va. at 410. In response, the General Assembly amended Code § 13.1-1039(A) to enable an LLC's operating agreement to allow for the assignee of a membership interest to participate in management. *See* 2013 Acts, ch. 772. This amendment does not affect the portion of the opinion discussing what language is required to expressly exempt an LLC from the dissociation statute, which is the part of the *Ott* holding relevant to our analysis.

[6] Another provision of the same section, Section 2.4(e), allows for action by written consent, providing that "[a]ny action required or permitted to be taken" by the members may be done so by written consent if the consent is "signed by the holders of outstanding interests having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all interests were present and voted."

Members" are defined in the agreement and do not explain whether voting by the members was to be done by proportion to their membership interest or in proportion to their contributions to the company. In addition, the conflicting provisions of Section 3.1 also create an ambiguity. Section 3.1 first provides that 3T Federal's management "shall be vested in one Manager, appointed by that person upon whom eligibility to participate in the SBA's 8(a) program is based," which seems to rest unilateral control in Yadav, but also provides that a "Manager may be removed and a successor appointed by a vote of the Members," seemingly allowing a manager to be removed by an undefined vote of the members.

Because the operating agreement's terms are ambiguous, the circuit court uses parol evidence to discern the parties' intent.[7] "[W]hen a contract is ambiguous, the Court will look to parol evidence in order to determine the intent of the parties." *Eure v. Norfolk Shipbuilding & Drydock Corp., Inc.*, 263 Va. 624, 632 (2002). "The language of a contract is ambiguous if 'it may be understood in more than one way or when it refers to two or more things at the same time.'" *Video Zone, Inc. v. KF & F Props., L.C.*, 267 Va. 621, 625 (2004) (quoting *Eure*, 263 Va. at 632).

Here, Yadav's extrinsic evidence presented at trial consisted of an email from Steven Koprince, the attorney who drafted the September 2012 operating agreement. In this email, Koprince shared concerns that Section 2 of the June 2012 operating agreement could be interpreted to allow a situation where "a majority of those present would decide the outcome of the vote" and therefore in the September 2012 operating agreement he "changed Section 2.4(c)

---

[7] We note that "on appeal, this Court may affirm the judgment of a circuit court if first, the circuit court arrived at the 'right result' but relied on different reasoning, and second, the appellate analysis is largely legal and does not require additional factual findings." *Esposito v. Va. State Police*, 74 Va. App. 130, 134 (2022). Here, because the circuit court weighed the parol evidence in its letter opinion, we find that our legal analysis concerning this evidence does not require additional factual findings.

to provide that a quorum exists only when at least 51% of Members are present" so that Yadav's "presence is required for a valid meeting." Yadav also introduced VA forms signed by the Agrawals indicating that "at least 51% of [3T Federal] is owned and controlled . . . by Veterans or service-disabled Veterans" and correspondence from the VA explaining that 3T Federal did not qualify as a SDVOSB because Yadav, the service-disabled veteran, did "not have full control over all decisions" under the parties' prior operating agreement.

The Agrawals also introduced parol evidence about how the September 2012 operating agreement was structured. Rajeeva testified that after the execution of the June 2012 operating agreement, he told Yadav that he was uncomfortable with it because he did not feel that it gave him an adequate say in management decisions, and asked Yadav to address that, which led to the September 2012 operating agreement. The circuit court noted in its letter opinion that the June 2012 operating agreement provided that "at all meetings of the members, all matters shall be decided by Fifty One Percent vote of the interests held by Members," while the September 2012 operating agreement omitted this language, which the court found "show[ed] an intent to revert back to the default rules." The court also rejected Yadav's argument that the members knew that Yadav himself must be able to fully control all decisions of 3T Federal when they signed the VA forms, finding that the "[m]embers' knowledge of the CFR rules [was] not compelling in this case." As trier of fact, the court had the ability to accept Rajeeva's parol evidence and reject Yadav's. "The construction of an ambiguous contract is a matter submitted to the trier of fact, who must examine the extrinsic evidence to determine the intention of the parties." *Tuomala v. Regent Univ.*, 252 Va. 368, 374 (1996). When there is a "sharp divergence in the parol evidence submitted by the opposing parties, it [is] for the [fact finder] to resolve the conflict." *Vega v. Chattan Assocs.*, 246 Va. 196, 202 (1993). Therefore, we conclude that the circuit court did not err in determining that the parties intended for the default rule of voting by contribution to apply

to the September 2012 operating agreement, and accordingly the Agrawals had the necessary voting power to remove Yadav by written consent.[8]

### B. Use of Designated Agreed Value of Contributions

Yadav further argues that even if the Act's default voting rule applied, he had 51% of the voting power in 3T Federal because the parties' designated capital contributions in the January 2009 operating agreement gave him 51% of the voting power in the company. The January 2009 operating agreement provided that the members' initial contribution to 3T Federal's capital was "stated to be $200,000," with Yadav contributing $102,000, Rajeeva $49,000, and Poonam $49,000, meaning a 51% contribution from Yadav and a 24.5% contribution each from Rajeeva and Poonam. However, none of the parties made any of the contributions listed in the January 2009 operating agreement, nor did they make any subsequent capital contributions following the January 2009 operating agreement. Because Yadav did not actually make the initial capital contribution, nor any subsequent capital contributions, he did not have 51% of the capital contributions granting him majority control under the statutory default rule of voting by contribution.

Yadav argues to the contrary, relying on *Gowin v. Granite Depot, LLC*, 272 Va. 246 (2006), for the proposition that our Supreme Court has found "parties' designation of capital contributions to be sufficient, even if money was not actually transferred." *Gowin* is inapposite

---

[8] Yadav further argues that in making its ruling, the circuit court erred in focusing solely on Section 2.4 of the operating agreement, and in doing so failed to harmonize this section with Section 3.1 of the operating agreement. Yadav argues that these provisions create an ambiguity that can only be resolved by interpreting the second provision as requiring a voting procedure that is in proportion to membership interest, because Section 3.1 gives the manager appointment power exclusively to him as the member with Section 8(A) eligibility. However, because we determine that the parol evidence as weighed by the circuit court indicates that the parties intended to use the default rule of voting by contribution, we reject his argument that the court failed to harmonize Sections 2.4 and 3.1, as any ambiguity in the language of operating agreement was resolved by the use of parol evidence.

to the facts here.  In *Gowin*, the minority member of an LLC brought a derivative action after the majority owner member eliminated the minority member's interest for failure to make payment on a promissory note for his capital contribution.  *Id.* at 251.  Our Supreme Court held that "[a] provision in an operating agreement allowing a member's promissory note to satisfy the capital contribution requirement is an accommodation that allows a person to become a member before paying the full amount of the required capital contribution to the company at the moment of membership"; however, "[t]he failure to pay the promissory note in accord with its terms . . . would be a failure to meet the capital contribution requirements," and therefore termination of membership would be permitted.  *Id.* at 256-57.  In that case, termination of the minority member's interest was improper because the promissory note was a demand note, and no demand for payment had been made by the majority member or the LLC.  *Id.* at 258.  The holding in *Gowin* is related specifically to promissory notes and stands for the proposition that an individual can become a member of an LLC through a promissory note without paying on that note if the LLC's operating agreement allows for such an arrangement.  It does not support Yadav's argument that the agreed contributions in the January 2009 operating agreement control here, where the January 2009 operating agreement stated that "[m]embers initially shall contribute to the Company capital as described in Exhibit 3," and then no capital contributions were made by any member.  Therefore, we reject Yadav's argument that, even under the default rule of voting by contribution, he had 51% of the voting power in 3T Federal.

## III.  CONCLUSION

For the reasons stated above, we hold that the circuit court did not err in ruling that the Agrawals had the necessary voting power to remove Yadav as manager of 3T Federal.  Further, the court did not err in declining to treat the designated agreed value of the contributions in the

- 13 -

January 2009 operating agreement as the actual amount of contributions made by the members. Accordingly, we affirm the decision of the circuit court.[9]

*Affirmed.*

---

[9] Yadav also argues that the September 2012 operating agreement was not binding on the members because they had failed to agree on a material term when creating the contract—the determination of their voting power. For a contract to be binding, it "must be sufficiently definite to enable a court to give it an exact meaning." *Dean v. Morris*, 287 Va. 531, 537 (2014) (quoting *Smith v. Farrell*, 199 Va. 121, 127 (1957)). "An incomplete contract . . . is one from which one or more material terms have been entirely omitted." *Id.* at 537-38 (quoting *Smith*, 199 Va. at 128). We find no merit in this argument because although the September 2012 operating agreement did not define the term "majority vote" or "vote of the members," the parol evidence introduced established that the parties intended for the default rule of voting by contribution to apply.

- 14 -

Causey, J., dissenting.

Respectfully, I dissent. As the Supreme Court noted in *Ott v. Monroe*, 282 Va. 403 (2011), we apply contract principles to the interpretation of LLC operating agreements. *See* 282 Va. at 407. Thus, "we must gather the *intent* of the parties and the meaning of the language . . . *from an examination of the entire instrument*, giving full effect to *the words the parties actually used.*" *Boedeker v. Larson*, 44 Va. App. 508, 519 (2004) (emphasis added) (quoting *Layne v. Henderson*, 232 Va. 332, 337-38 (1986)). Here, the parties signed and agreed in the September 2012 version of the operating agreement that 3T Federal Solutions would comply with requirements for participation in the SBA's 8(a) program. Per such requirements, as the majority correctly states, Yadav must have "unconditional[] own[ership] and control[]" of the company.

Reading the entire operating agreement, specifically Section 2.4 (a) through (g), Section 3.1, and Section 8.1, and harmonizing these sections, yields only one interpretation: that each member votes by ownership interest. Here, to hold otherwise would cause various sections and subsections to conflict. I agree with the majority that when the terms of an operating agreement are unclear, a court should first try to determine the parties' intent before applying the default statutory rule. However, I do not agree that parol evidence is needed to discern the parties' intent here.

The parties disagree as to the definition of "majority vote" in Section 2.4(d). I agree that the definition of "majority vote" is not immediately clear upon a plain reading of this language. But the circuit court need not resort to parol evidence to reach the meaning of "majority vote" because that term is not genuinely ambiguous. "An ambiguity is not present simply because one could 'hypothesize "opposing interpretations" of the same contractual provision.'" *Worsham v. Worsham*, 74 Va. App. 151, 168 (2022) (quoting *Erie Ins. Exch. v. EPC MD 15, LLC*, 297 Va. 21, 29 (2019)). Nor is a contract ambiguous "merely because the parties disagree as to the

- 15 -

meaning of the terms used." *Allen v. Allen*, 66 Va. App. 586, 596 (2016) (quoting *TM Delmarva Power, L.L.C. v. NCP of Virginia, L.L.C.*, 263 Va. 115, 119 (2002)). To clarify the meaning of "majority vote," the court should determine the parties' intent for those words. And it should do so by trying to harmonize unclear terms with the rest of the operating agreement.

When there is not one plain meaning of a term, before looking to parol evidence for the parties' intent, a court should first "construe[ the contract] as a whole" and "*[collect] the intention of the parties . . . from the entire instrument* and not from detached portions." *Worsham*, 74 Va. App. at 167 (emphasis added) (quoting *Sweely Holdings, LLC v. SunTrust Bank*, 296 Va. 367, 376-77 (2018)) (determining meaning of contract term by considering the words used in other sections of the contract and declining to consider parol evidence). "'[E]very word, clause, and provision of the [contract] "should be considered and construed together and *seemingly conflicting provisions harmonized when that can be reasonably done*, so as to effectuate the intention . . . expressed"' by the parties." *Id.* at 167-68 (alterations in original) (emphasis added). Even the Court in *Ott* recognized that harmonizing an agreement is the preliminary step in interpreting an operating agreement. *See* 282 Va. at 407 ("When interpreting a contract, we construe it as whole. . . . *We harmonize its provisions and give effect to each of them when it reasonably can be done*." (emphasis added)).

In the most basic terms, we determine the terms of a contract based on (1) what the parties said and (2) what the parties did. This means that first, we gather the parties' intentions from the words they used in the contract—what they "said." If those words do not clarify any unclear terms, we then look at parol evidence—what they "did." Parties are bound by the intent "*expressed by them in the words they have used*, and courts are bound to say that *the parties intended what the written instrument plainly declares*," even if the parties may testify that they had contrary intentions. *Golding v. Floyd*, 261 Va. 190, 192 (2001) (alteration in original)

- 16 -

(emphasis added) (quoting *W.F. Magann Corp. v. Va.-Carolina Elec. Works, Inc.,* 203 Va. 259, 264 (1962)). "Thus, if the intent of the parties can be determined from the language they employ in their contract, *parol evidence respecting their intent is inadmissible*." *Id.* at 192-93.

Thus, under controlling case law, if an agreement term is subject to multiple conflicting interpretations, the court must first try harmonizing that term with the rest of the agreement. If this is impossible, the term is considered ambiguous, and the court should next look to parol evidence. If neither harmonization nor parol evidence provide clarity about what the parties intended, the default statutory rule applies, as in *Ott v. Monroe*, 282 Va. at 403.[10]

Here, harmonization provides clarity of the parties' agreement. In determining the meaning of the words "majority vote" in Section 2.4(d), subsection (d) must be read in the context of Section 2.4 in its entirety, which contains subsections (a) through (g). To harmonize subsections 2.4(c) and (e) of the operating agreement, the only possible definition of "majority vote" in Section 2.4(d) is that members vote by membership interest. Subsection (c) states that "[a]t each meeting of Members, a quorum shall exist only if Members constituting at least 51%

---

[10] I would note that the conclusion in *Ott v. Monroe*, 282 Va. at 403, that the default statutory rule applied turned on the facts that (1) the subject matter of the LLC provision dealt with a defining characteristic of LLCs—the transferability of membership interests; and (2) Virginia law prohibited free transfer of membership interests. The Court in *Ott* discussed that "free transferability of ownership interests" was one of the "four principal characteristics of corporations." *Id.* at 408. "When the Act was enacted in 1991, federal tax regulations denied the pass-through treatment afforded partnerships if a business entity possessed three of the four principal characteristics of corporations." *Id.* The Court emphasized that the Act was thus "drafted to avoid" the free transferability of ownership interests and analogized the transferability of ownership interest in an LLC to "transferability of a partner's interest in a partnership." *Id.* "[T]he control interest in a partnership is personal to the partner and cannot be bestowed on another by the unilateral act of a partner even if the words of his conveyance do not expressly limit its scope." *Id.* at 409. It was in this context—that the history of the Act showed that limited transferability of ownership interest is a defining characteristic of LLCs—that the Court concluded the statutory default rule applied in *Ott*. Further, the Court in *Ott* held that Virginia law does not permit a member to freely transfer his "control interest." *See id.* at 410-11.

of the Membership interest in the Company are present.  If no quorum is present, the meeting shall adjourn with no further action taken."  Subsection (e) states that

> Any action required or permitted to be taken by the Members of the Company may be taken without a meeting, without prior notice, and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding interests *having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting* at which all interests were present and voted.  Any such consent may be in counterparts and shall be effective as of the date of the last signature thereon needed to make it effective unless otherwise provided therein.

(Emphasis added).

Under subsection (c), action can only be taken at a meeting if a quorum—51% of the membership interest—is present.  But if we interpret the words "minimum number of votes that would be necessary to authorize or take such action at a meeting" in subsection (e) to mean that each member has one vote, subsection (e) permits two members to simply act by written consent without ever having a meeting with a quorum present.  Only by interpreting the phrase to mean that members vote by membership interest can we give effect to both subsections (c) and (e).

Additionally, harmonizing different phrases within Section 3.1 with each other compels an interpretation of "majority vote" that members vote by ownership interest.  Section 3.1 provides that "[e]xcept as expressly provided otherwise herein, management of the Company shall be vested in one Manager, appointed by that person upon whom eligibility to participate in the SBA's 8(a) program is based."  This phrase clearly gives management control to Yadav.  However, Section 3.1 later states that "[a] Manager may be removed and a successor appointed by a vote of the Members."  Interpreting "majority vote" in a way that would allow the Agrawals to remove an appointed manager would curtail Yadav's management control provided earlier in the section, causing phrases within Section 3.1 to conflict with each other.

- 18 -

Moreover, harmonizing Sections 2.4 and 3.1 with Section 8.1 requires this interpretation. Section 8.1 is entitled "Application for and Participation in the 8(a) Program," and provides that

> The Manager is directed, by this amended Operating Agreement to make application to the SBA to participate in the 8(a) Business Development program, and when admitted to this program to abide by all of the rules and regulation [sic] governing the operation of this program, for the entire span of time in which the company is a participant in the 8(a) program.

To interpret "majority vote" in a manner that would let the Agrawals control company actions and management would contradict Section 8.1, which states that the company will abide by the rules for participation in the SBA's 8(a) program. One rule is that Yadav maintain "unconditional[] own[ership] and control[]" of the company. Thus, to harmonize Sections 2.4 and 3.1 with Section 8.1, the only possible interpretation of "majority vote" is that members vote by membership interest because Yadav, with his 51% ownership interest, would have voting control.

Harmonizing the provisions of the agreement here leaves only one possible interpretation of how the parties intended to weigh members' votes: by ownership interest. To adopt another interpretation of "majority vote" would cause subsections (c) and (e) of Section 2.4 to be in conflict, phrases within Section 3.1 to conflict, and Sections 2.4 and 3.1 to conflict with Section 8.1. Thus, weighing each member's vote according to membership interest, I would hold that the Agrawals' written consent removing Yadav as manager had no effect.

For the reasons stated, I would reverse the circuit court's ruling that the parties intended to use the default rule in Code § 13.1-1022 for counting members' votes. Instead, I would hold that, upon harmonizing the conflicting provisions of the operating agreement, the parties intended that each member votes according to ownership interest, and remand the case for further proceedings.

- 19 -