# Richmond

## PROGRESSIVE CONSTRUCTION COMPANY, INC. v. LINWOOD A. THUMM AND WILLIAM H. BROWN, T/A VIRGINIA HEATING DISTRIBUTORS.

June 10, 1968.

Record No. 6575.

Present, All the Justices.

*Robert E. Brown; H. Lee Kanter (Kanter & Kanter*, on brief), for plaintiff in error.

*Thomas H. Willcox, Jr. (Willcox, Savage, Lawrence, Dickson & Spindle*, on brief), for defendants in error.

BUCHANAN, J., delivered the opinion of the court.

Progressive Construction Company, Inc., herein referred to as plaintiff or Progressive, filed its motion for judgment against Linwood A. Thumm and William H. Brown, trading as Virginia Heating Distributors, referred to herein as Virginia Heating or defendants,[1]

---

[1] The action was brought against Thumm, trading as Virginia Heating Distributors. Later it developed that William H. Brown was a partner and he was made a defendant.

for $14,968.72 as damages for breach of contract. At the conclusion of the evidence the court, on defendants' motion, struck out the plaintiff's evidence and entered judgment for the defendants on the ground that the contract alleged was not proved. We granted plaintiff a writ of error.

Plaintiff, in the spring of 1964, was awarded a contract for the construction of housing units for the United States Navy at the Armed Forces Staff College and Camp Allen, in the city of Norfolk. On June 19, 1964, plaintiff entered into a subcontract with National Sheetmetal, Inc., herein referred to as National, by which the latter corporation agreed to supply and install the air conditioning and heating equipment on these jobs for a consideration of $143,000.00.

National was a Virginia corporation, owned one-half by Thumm and one-half by Charles F. Jackson. Virginia Heating Distributors was not a corporation but a trade name used by Thumm, who was sole owner until January 1, 1965, when William H. Brown, a former employee, acquired a ten percent interest and became a partner. The only business of Virginia Heating was the sale and supplying of heating and air conditioning equipment. It did not install the equipment sold by it.

Among those to whom Virginia Heating submitted prices for materials for the heating and air conditioning on the Navy jobs was Charles F. Jackson, owner of Air Comfort, Inc., to which Virginia Heating had sold materials for some time and which was indebted to Virginia Heating for about twenty thousand dollars. Jackson suggested to Thumm that the Progressive job was a chance for Thumm to get back part of this twenty thousand dollars if Thumm would supply the material for the job. As a result Thumm and Jackson formed and procured a charter for National Sheetmetal, Inc., of which Jackson was president and Thumm was assistant treasurer. Thereafter National, as subcontractor, and Progressive (by its then name of Southside Plumbing Company, Inc.) entered into a written contract dated June 19, 1964, and signed on behalf of National by Charles F. Jackson, president, and for Progressive by J. E. Wood, secretary-treasurer, by which National agreed to furnish all materials, labor, plant and equipment for the heating, plumbing and air conditioning as therein described. National was the only bidder for that part of Progressive's main contract.

After National's work was begun Thumm heard rumors that Jackson, its president, might improperly use some of the funds and

materials being furnished for the job by Virginia Heating. He so informed Wood, secretary-treasurer and owner of two-thirds of the stock of Progressive, by telephone on August 31, 1964, and next day wrote to Wood thanking him for his suggestion that all payment checks be made jointly to National and Virginia Heating. The letter stated that Virginia Heating was supplying National with all materials for this job and was in fact "financing the entire operation". From August 8, 1964, to July 22, 1965, most of thirty-four checks issued by Progressive were so written and were deposited to the credit of Virginia Heating. Five were issued to National alone, the last dated January 8, 1965.

At the trial Thumm was called and examined as an adverse witness by Progressive. He testified that early in January, 1965, it had become obvious that Jackson was not attending to the job and he had had numerous complaints from Progressive that the work was not going well and that Progressive could not find Jackson to complain to him. Thumm then had a meeting with Jackson and as a result Jackson submitted his resignation as president of National and left town. National then owed Virginia Heating about forty-five thousand dollars for materials and for money advanced to pay labor.

After Jackson left, Thumm, as an officer of National, employed a man to make an estimate of the labor cost for completing the job. This estimate indicated to Thumm that National could finish the job and possibly make fifteen to twenty thousand dollars if everything went as it should. Thumm said his primary concern was to get back some of the forty-five thousand dollars which National owed Virginia Heating.

In the meantime, work continued and around the first of February, 1965, Thumm called and talked to J. E. Wood by telephone. Progressive contends that this telephone conversation constituted the oral contract on which its action for damages was based. With respect thereto, Thumm, questioned by Progressive's counsel, testified:

> "I stated to Mr. Wood that I had talked to some people who said that money still could be—the job still could be completed and some of the money could be recovered and that I was willing to go ahead in my capacity as head of National Sheet Metal and take over the job when Mr. Jackson was no longer available, and my company, Virginia Heating Distributors, would supply the materials if he would meet weekly payrolls, because I could not go any further in jeopardizing my own company."

Thumm further testified: "I think I made it very clear that I was not involving Virginia Heating nor was I taking over National Sheet Metal's contract. I was calling him to state that Virginia Heating would continue to supply materials in the hope of regaining some of its lost money if he were willing to advance payrolls until the job was completed, and that was the extent of my entire conversation."

J. E. Wood, testifying as a witness for Progressive, was asked by its counsel to "tell us exactly what Mr. Thumm told you that day on the telephone," and Wood answered:

"Well, the conversation was very short. He said that Mr. Jackson had left and that he would like to take the job over and complete it, and that he figured he could make fifteen or twenty thousand dollars, and he said if I would make the payrolls that he would furnish the material. Well, I certainly agreed to furnishing the labor, there is no question about it, but not beyond the contract. I mean we had no idea it was going beyond the contract."

Defendants objected to the last two sentences as not being part of the conversation, and the court ruled that the answer should be limited to the question. In response to a question by the court Wood stated that he had related the full conversation. Wood had testified at a former time that in the telephone conversation Thumm did not say who was going to take over the job "But I assumed he was going to go in with National Sheet Metal to do it. I just don't know."

After this telephone conversation, Thumm continued on the job until late in July [1965], at which time Progressive declined to meet further payrolls on the ground that it had paid out the contract price agreed on in the contract with National, and "it would be up to Mr. Thumm to finish the job." Thumm then discontinued the work and at Wood's request gave him "a letter of voluntary default." This letter was on the letterhead of National Sheetmetal, Inc., and signed by L. A. Thumm, assistant treasurer. Afterwards Progressive, through another contractor, finished the job at a cost of $14,968.72 above National's contract, which is the amount sued for.

On cross-examination Wood stated that he did not claim that Virginia Heating was made a subcontractor by reason of being a joint payee of the checks, and that whatever claim his company had against Virginia Heating came from the telephone conversation with Thumm in February, 1965, and that after that conversation Progressive continued to advance payroll checks as it had done before.

After the telephone conversation in February, Progressive addressed a number of letters to National, beginning March 1, 1965, some of which bore the phrase "Attention Mr. L. A. Thumm," and under date of August 3, 1965, Progressive's attorney wrote to National that Progressive had been advised by Thumm that it would be impossible for National to complete its contract without additional compensation; that hence it was necessary to treat this contract in default, and to award a contract for completion of the work, and that claim would be made against National for the additional cost of completion.

On the same day the same attorney wrote to Virginia Heating, stating that Progressive had informed him that Virginia Heating had assumed National's contract; that National had advised that it could not complete the contract for the agreed price and that Thumm had stated that Virginia Heating could not complete it; that as a result claim would be made against Virginia Heating for the additional cost of completion. Wood testified that as far as he knew this letter was the first thing in writing indicating that Progressive expected Virginia Heating to pay anything and that Virginia Heating promptly denied any responsibility.

On March 19, 1965, subsequent to the telephone conversation, Thumm wrote a letter on Virginia Heating stationery with Virginia Heating's name signed thereto, addressed to Alabama Electric Company, directing that company to proceed with wiring the furnaces at the Camp Allen site, and stating that "invoices would be paid by us" and "We will also assume full responsibility for any required cutting and patching." Thumm testified that Alabama Electric required this procedure before it would undertake the work.

On February 9, May 19 and in July, 1965, Progressive sent telegrams to Virginia Heating directing certain actions to be taken on the job, the one in July stating that unless more men were on the job by July 8, Progressive's would hire them and back charge Virginia Heating's account. Thumm testified that these telegrams were from the construction superintendent at the job site and none came from Progressive office in Farmville. He did not make any response to them. He stated that he continued to work under his agreement with Wood until late July. At that time Wood told him that all the contract money had been used up and that was the end of it. Thumm then told him he could not proceed any further and Wood asked him for a letter "stating that you are in default on the job," which was given on July 27, 1965.

A sheet metal worker employed by Thumm said he worked for Virginia Heating from June 19 to July 23 and Thumm paid him. He was present and heard a conversation between Thumm and Wood in which Thumm said he could not go any further, that he was "sixty thousand dollars hooked," and "This could very well break my company. I can't go any further."

All of the testimony of Thumm stated above was given by him when called as an adverse witness by the plaintiff. At the conclusion of plaintiff's evidence Thumm testified as a witness in his own behalf. He introduced records showing the materials furnished to National by Virginia Heating for the jobs in question and the payments of money by Virginia Heating to National for payrolls and other items paid out, together with withholding tax records and the checkbook of National and its final bank statement of May 20, 1965, for the purpose of showing that National continued in the work. He testified that between the time Progressive stopped paying and the time of his meeting with Wood, two payrolls had been met by Virginia Heating for which it was not reimbursed. He said the weekly submissions to Progressive of payrolls were made on plain stationery; that National carried the workmen's compensation insurance on this job and Virginia Heating did not carry such insurance; that payroll affidavits on a government job have to be submitted weekly and that on through the spring of 1965 National submitted these affidavits to Progressive.

On this evidence the plaintiff argues that there was a jury question as to whether Virginia Heating became jointly obligated, either as a guarantor or a joint contractor, with National, to complete National's contract with Progressive. The trial court disagreed and stated:

" * * * But there is no issue of fact here as I see this case. The defendant in this case as an adverse witness testified very specifically what was said on the phone. There is no contradiction of that by Mr. Wood. I cannot from the evidence in this case permit a jury to say that there arises here as a result of the verbal conversation between these two people a contract of guaranty or surety or, for that matter, any other kind of contract. I realize that we are dealing here with two men who knew what they were doing. Mr. Thumm knew and Mr. Wood knew too. But the Court can't conclude in this case that there is sufficient factual basis to submit this

to the jury and for that reason I am going to strike the evidence on all three counts." [2]

We agree with the conclusion of the trial court. The evidence clearly is not sufficient to establish that Virginia Heating made a contract with Progressive to take over and complete the contract between Progressive and National. Wood testified that his company, Progressive, awarded the heating and air conditioning subcontract to National, whose bid was the only one received for that work; that when National failed to perform Thumm called him and stated that he would like to take the job over and complete it, and that "if I [Wood] would make the payrolls that he would furnish the material."

Wood added that he certainly agreed to furnish the labor, but not beyond the contract, "I mean we had no idea it was going beyond the contract." But he did not testify, and does not claim, that he expressed to Thumm such limitation on Progressive's part of the agreement. On the contrary, he testified that Virginia Heating was not mentioned in this conversation.

Admittedly Thumm hoped to make some money by completing the contract and so stated to Wood. His reason for this hope, not stated to Wood, was that the profit, if any, might be used to reduce the very large indebtedness of National to Virginia Heating. In proceeding under the contract made with Wood, Thumm used property and money belonging to Virginia Heating; but this in no way made Virginia Heating a party to National's contract with Progressive. Nor did it or any other of the transactions of Virginia Heating shown in the evidence bind Virginia Heating to take over and complete National's contract with Progressive.

"In order that there may be an agreement, the parties must have a distinct intention common to both and without doubt or difference. Until all understand alike, there can be no assent, and, therefore, no contract. * * *" 17 C.J.S., Contracts, § 31, p. 635. *Smith v. Farrell*, 199 Va. 121, 127-8, 98 S.E.2d 3, 7.

"It is fundamental that no person may be subjected by law to a contractual obligation, unless the character of the obligation is definitely fixed by an express or implied agreement of the parties. In order to be binding, an agreement must be definite and certain

---

[2] One of the three counts in plaintiff's motion for judgment based the liability of National on a theory of novation which the plaintiff later abandoned.

as to its terms and requirements; it must identify the subject matter and spell out the essential commitments and agreements with respect thereto. * * " 17 Am. Jur. 2d, Contracts, § 75, pp. 413-4.

Since the evidence failed as a matter of law to prove the existence of the contract sued on, the court properly struck out the plaintiff's evidence and entered judgment for the defendants. *Mullins* v. *Mingo Lime, Etc., Co.*, 176 Va. 44, 48, 10 S.E.2d 492, 493. 17A C.J.S., Contracts, § 611 (a), p. 1224.

As the contract sued on was not proved, it is not necessary to consider whether if proved it would have been barred by the statute of frauds, Code § 11-2, 1964 Repl. Vol., as asserted by the defendants.

The judgment appealed from is affirmed.

*Affirmed.*