**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-1590**

PETR BOCEK, M.D., PHD,

        Plaintiff – Appellant,

    v.

JGA ASSOCIATES, LLC; JOSEPH P. AMATO; A2 MEDICAL GROUP, INC.,

        Defendants – Appellees,

    and

ALLERGY CARE CENTERS, VIRGINIA, INC.,

        Defendant,

    v.

LENKA BOCEK,

        Movant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:11-cv-00546-CMH-JFA)

Argued: March 19, 2013        Decided: August 1, 2013

Before TRAXLER, Chief Judge, and WILKINSON and NIEMEYER, Circuit Judges.

Affirmed in part, reversed in part, and remanded by unpublished opinion. Chief Judge Traxler wrote the opinion, in which Judge Niemeyer concurred in part and concurred in the judgment. Judge Niemeyer wrote a separate opinion concurring in part and concurring in the judgment. Judge Wilkinson wrote a separate opinion concurring in part and dissenting in part.

————————————

**ARGUED:** S. Micah Salb, LIPPMAN, SEMSKER & SALB, PLLC, Bethesda, Maryland, for Appellant. David Edward Sher, SHER, CUMMINGS & ELLIS, Arlington, Virginia; Brian Christopher Athey, WEBSTER BOOK, LLP, Alexandria, Virginia, for Appellees. **ON BRIEF:** Mary E. Kuntz, Ph.D., Judah Katz, Jeff J. Kim, LIPPMAN, SEMSKER & SALB, PLLC, Bethesda, Maryland, for Appellant. Mark D. Cummings, SHER, CUMMINGS & ELLIS, Arlington, Virginia, for Appellees JGA Associates, LLC, and Joseph P. Amato.

————————————

Unpublished opinions are not binding precedent in this circuit.

TRAXLER, Chief Judge:

Petr Bocek brought this action against business consultant Joseph Amato and two companies associated with Amato after the defendants purchased a medical practice for themselves rather than for Bocek. The district court granted summary judgment in favor of the defendants, and Bocek appeals. We affirm in part, reverse in part, and remand for further proceedings.

I.

Plaintiff Petr Bocek is a medical doctor specializing in the treatment of allergies. Defendant Joseph Amato is the manager and sole member of defendant JGA Associates, LLC, a business consulting firm.

Bocek contacted Amato seeking assistance with the formation and financing of a new allergy care medical practice. On November 10, 2010, the parties entered into a contract (the "Consulting Agreement") through which JGA agreed "to review and report on the feasibility of the proposed allergy medicine practice and prepare a business proposal for funding a start-up medical practice" and "render such other services as may be agreed upon by the Client and the Consultant." J.A. 64. Under the terms of the Agreement, JGA would be compensated through "development fees" (hourly billing for consulting services) and

3

a "completion fee" of two percent of the face amount of any business loan arranged by JGA.

A few days after signing the Consulting Agreement, Bocek asked Amato about the feasibility of buying an existing medical practice rather than starting a new practice. Bocek told Amato that Allergy Care Centers ("ACC"), where Bocek had previously worked, was being offered for sale by the administrator of the estate (the "Estate") of ACC's owner, who had died two years earlier. Amato responded positively, explaining that "[t]he acquisition of an existing operating practice is always more attractive if the price and the historic financial performance make sense." J.A. 68. After Bocek raised the possibility of buying ACC, there were no further discussions about Bocek starting a new practice; the relationship between Bocek and Amato focused exclusively on acquiring ACC's assets.

Bocek told Amato that his acquisition of ACC might be complicated because he had been fired from ACC and was in the process of negotiating a severance package, and Bocek asked Amato to pursue the purchase of ACC without revealing Bocek's identity as the buyer. To keep Bocek's name out of the negotiations, Amato and Bocek ultimately settled on a "straw purchase" approach by which JGA (or an alternate holding company set up by Amato) would buy ACC and transfer it to Bocek after closing.

4

Emails show that by the end of December 2010, the parties were in general agreement on the overall structure and ultimate goal of the deal – ownership of the practice by Bocek – and what needed to be done to move forward with the transaction. There was, however, no agreement as to the structure or mechanics of the transfer from JGA to Bocek. For example, in a December 23 email, Amato told Bocek that while there were still open issues, Amato "intend[ed] to move forward" with the purchase of ACC "based on a few specific parameters," including:

1. That our firm (or an alternate holding company) intends to initially purchase the practice with the direct intention of selling the practice (or the holding company) to you.

2. That you will commit to work with our firm during the due diligence process with the sole intention of becoming the eventual owner of ACC. The timing of the change in ownership would be automatic and agreed to by our firm and yourself before we execute the Purchase Agreement. The transfer of ownership to you will depend on your ability to fund the purchase of the practice from our firm and how quickly "we" are able to secure third-party financing for you to buy the practice from our firm; or if third-party financing is not immediately available, our firm would hold a seller-held note until such time that conventional funding can take out our note. The bottom line is that we would intend on transferring ownership to you as soon as all parties agree we can, that is after our firm's purchase of the practice from the estate.

. . .

4. That you commit to buying the practice and/or running the practice (as owner or lead physician, your choice) under contract with the new company as a condition of us purchasing ACC. There may be a reason

5

you do not want to own the practice immediately after our purchase of the firm; if so, we need to understand specifically what you want and we need to be sure that if we purchase the practice, day one you will be the company's lead physician (either as the owner or key employee). You will need to understand that we will not go through with the purchase of ACC if you are not a direct part of our exit strategy.

J.A. 75. An email sent by Amato a few days later, after Bocek had passed along questions from his attorney about the purchase, reconfirmed the basic plan:

> We are not purchasing the business on the behalf of an undisclosed purchaser; JGA "is" purchasing the business. Our intentions with the business after the deal is consummated will not be a concern for the Seller; we will be sure that nothing precludes us from selling the business once we have purchased [it]. . . . But please understand our only intention once we own the business would be to sell the business to you; and as I said before I do not think the estate could care less.

J.A. 81 (emphasis added).

On January 22, 2011, Amato sent Bocek an invoice for his services. The invoice reflected Bocek's prior payment of $3,800 and sought an additional $4,574.40 "for expanded hours and third-party costs associated with the project development and acquisition negotiations for the purchase of the Allergy Care Center business operation on behalf of JGA Associates and Dr. Petr Bocek." J.A. 1048.

On February 3, Amato sent the Estate a Letter of Intent ("LOI") through which "JGA Associates, LLC, or its assigns" offered to purchase ACC's assets for $1,000,000. J.A. 102. The

6

LOI obligated the parties to negotiate in good faith, but the LOI was otherwise not binding; until the execution of a mutually agreeable asset purchase agreement, either side could walk away from the transaction without penalty. The Estate accepted the offer and returned an executed copy of the LOI to Amato late in the afternoon on February 8, 2011.

Earlier that same day (February 8), Amato had visited one of the ACC offices to meet with Margaret Crook, ACC's practice manager. During the meeting, Crook told Amato that Bocek had been fired after he sexually harassed employees and used another doctor's prescription pad to forge prescriptions for himself. This was the first Amato had heard of these issues; Bocek had told Amato that he had been fired, but he never provided any details about what happened, and Amato never asked. After meeting with Crook, Amato stalled and put off Bocek's various inquiries until he could verify what he had learned.

On February 15, the Estate filed a petition in a Pennsylvania "Orphan's Court" seeking approval for the sale of ACC. Bocek was then unaware that the sale was moving forward -- Amato had not informed Bocek that he submitted the LOI to the Estate on February 3 or that the LOI had been accepted.

On February 17, 2011, after reviewing documents that confirmed Crook's information, Amato sent a letter notifying Bocek of his intent to terminate their contractual relationship

7

in 10 days, in accordance with the terms of the Consulting Agreement. Amato explained the termination in general terms, stating that during the due diligence process, "it became apparent . . . that your involvement in any potential transaction would . . . sour the deal. It also became evident that we could not move forward with your participation in any potential transaction without the possibility of serious repercussions thereafter." J.A. 118.

Counsel for Bocek responded on February 22. Among other things, counsel noted that Amato, as Bocek's agent, had a continuing duty of loyalty to Bocek and that Amato would be breaching his contractual and fiduciary duties "if [he] were to turn the acquisition of ACC into a deal which is of benefit to [him]." J.A. 1084. At the time of this letter, counsel was unaware of evidence showing that Amato did not take his duty of loyalty seriously. For example, while Bocek was under the impression that JGA would buy ACC and then sell it to Bocek at cost, Amato and potential investors were emailing each other about the possibility of buying ACC for $1 million and immediately flipping it to Bocek for $2 million. See J.A. 1021-22. In addition, Amato repeatedly told Bocek that when a letter of intent was submitted to the Estate, the purchase price offered would be $1.2 million, even though Amato had already

8

submitted multiple draft LOIs with a purchase price of $1 million to the Estate. See J.A. 1059-68.

On March 2, 2011, Amato incorporated a new company, A2 Medical Group, Inc., to serve as the purchaser of ACC's assets. JGA at some point assigned its interests in the transaction to A2,[1] and the Estate and A2 executed an asset purchase agreement on May 13, 2011. Ten days later, the Orphan's Court approved the sale of ACC to "JGA Associates, LLC and its assigns in accordance with the purchase amount and terms set forth in the May 13, 2011 Asset Purchase Agreement." J.A. 1129. The sale closed on June 22, 2011. At no time between the February 17 termination of the Consulting Agreement and the closing of the sale did Bocek make an offer to purchase ACC.

After unsuccessfully seeking an injunction to prohibit Amato and JGA from buying ACC, Bocek filed an amended complaint

---

[1] No written assignment appears in the record, but emails from Amato and his partner in A2 make it clear enough for summary-judgment purposes that an assignment was effectuated in a way that was acceptable to the parties. See J.A. 899 (March 8 email from Amato informing Estate that his corporate attorney and his partner will "have the assignment document prepared that will tie the transaction together"); id. (March 8 email to Estate from Amato's partner stating that the attorney will "get me the assignment document to transfer the purchase from JGA to A2 Medical Group, Inc. since that will be the formal acquisition company"); see also Amato deposition, J.A. 1102 ("JGA eventually, as the Estate knew, was going to assign the purchase to someone. A2 medical was eventually established as the entity that would receive that assignment with the permission of the Estate.").

asserting four causes of action against Amato, JGA, and A2: (1) fraudulent conveyance and constructive trust; (2) breach of fiduciary duties; (3) breach of contract; and (4) breach of fiduciary duties as joint venturers. The district court granted summary judgment in favor of the defendants and dismissed the case. Bocek appeals, arguing that he presented evidence sufficient to preclude summary judgment as to each cause of action.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We review a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." T-Mobile Northeast LLC v. City Council of Newport News, 674 F.3d 380, 384-85 (4th Cir. 2012) (internal quotation marks omitted).

## A.

We begin with Count III, the breach of contract claim. The amended complaint set out the relevant terms of the Consulting Agreement, including the portion through which JGA agreed to

10

"render such other services as may be agreed upon by the Client and the Consultant." J.A. 26, 55. Bocek also alleged that he and JGA "agreed that JGA would purchase ACC's assets as a 'straw purchaser' and immediately transfer ownership thereof to Bocek." J.A. 55. Bocek alleged that JGA breached the Consulting Agreement by, inter alia, using information learned from Bocek for JGA's own benefit, and that JGA breached the contract by entering into the LOI and transferring its rights to A2, "thus ensuring that Bocek could not . . . acquire ACC's assets." J.A. 55.

The district court granted summary judgment in favor of the defendants. In the district court's view, Bocek was not claiming that JGA breached the Consulting Agreement, see J.A. 1207 n.1, but was only alleging that JGA breached a separate, oral agreement for the straw purchase and immediate re-transfer of ACC (the "Straw Purchase Agreement"). And with that understanding of the claim, the court then rejected it, explaining that "there is no evidence that the oral contract allegedly breached ever validly existed due to the absence of a meeting of the minds on the issue of Dr. Bocek's entitlement to rights in [ACC] subsequent to the execution of the Consulting Agreement." J.A. 1207. The defendants approach the issue similarly, contending on appeal that Bocek's breach of contract claim is premised not on the Consulting Agreement, but on "the

11

untenable and unsupported notion that he had an oral agreement with JGA to purchase a $1 million medical practice even though there is no evidence that he and JGA ever agreed on any of the material terms necessary to purchase [ACC]."  Brief of Appellee at 43.

While the Amended Complaint included allegations about the Straw Purchase Agreement, it also very clearly alleged breaches of the Consulting Agreement.[2]  On appeal, however, Bocek focuses on the Straw Purchase Agreement, not the Consulting Agreement. Bocek does not identify the district court's misreading of his breach of contract claim as an issue on appeal, see Brief of Appellant at 2, nor does he argue in the substantive portions of his brief that the defendants' actions amounted to breaches of the Consulting Agreement.  To the contrary, Bocek states throughout his brief that the services performed by JGA in connection with the ACC acquisition were not performed under the Consulting Agreement but were instead performed under the Straw

_____

[2] See J.A. 26, ¶ 45 (referring to November 2010 Consulting Agreement as "the Agreement"); J.A. 55, ¶ 305 ("JGA agreed, per the terms of the Agreement, to 'render such other services as may be agreed upon by the Client and the Consultant from time to time."); id., ¶ 309 ("JGA breached the Agreement by utilizing information learned from Bocek . . . to fully analyze the desirability of purchasing ACC's assets for JGA's benefit and not for the benefit of JGA's client, Bocek."); id., ¶ 310 ("JGA breached the Agreement by . . . ."); id., ¶ 311 ("JGA further breached the Agreement by . . . .").

12

Purchase Agreement.[3]  Because Bocek's position on appeal is that the defendants' ACC-related actions breached the Straw Purchase Agreement, not the Consulting Agreement, we are constrained to conclude that Bocek has waived any breach of contract claim premised on a breach of the Consulting Agreement.  See, e.g., West Va. CWP Fund v. Stacy, 671 F.3d 378, 389 (4th Cir. 2011) (arguments not raised in opening brief are waived).

The question, then, is whether a breach of contract claim based on the putative Straw Purchase Agreement is viable.  See Progressive Constr. Co. v. Thumm, 161 S.E.2d 687, 691 (Va. 1968) (To be binding and enforceable, a contract "must identify the subject matter and spell out the essential commitments and agreements with respect thereto.").  Bocek argues that the evidence in the record shows a meeting of the minds on all material terms of the Straw Purchase Agreement -- the identity of the parties, the nature of the work to be performed, the

---

[3] See, e.g., Brief of Appellant at 38-39 ("The acquisition of ACC was not envisioned by the Parties in the making of the [Consulting] Agreement and so the terms of that Agreement do not extend to the acquisition of an existing practice."); id. at 42 n.15 ("[T]he [Consulting] Agreement cannot be read to govern the acquisition of ACC because there is no evidence in the record of any agreement between the parties to expand the scope of work. Furthermore, the work necessary for the ACC acquisition was the subject of a separate agreement in which the Parties addressed, inter alia, JGA's compensation for those services and its role as straw purchaser."); id. at 45 n.17 ("The agreement for JGA's assistance to acquire ACC was clearly not envisioned . . . or done pursuant to the [Consulting] Agreement.").

13

duration of the agreement, and the compensation to be paid.  See Reid v. Boyle, 527 S.E.2d 137, 145 (Va. 2000) (listing essential terms of a contract for services).  According to Bocek, the district court improperly focused on the asset purchase agreement that the parties intended to enter into after JGA's straw purchase of ACC rather than the Straw Purchase Agreement.  In Bocek's view, the mechanics of the transfer from JGA to Bocek is not a material term of the ACC acquisition deal, and the absence of agreement over those details does not preclude enforcement of the contract.  We disagree.

The record shows that the parties were considering a number of ways to structure the transfer, including: (1) Bocek being made a minority partner in the entity actually purchasing ACC; (2) Bocek running the practice under contract with the purchasing entity; (3) Bocek obtaining a loan to cover the full purchase price, which would permit the transfer to Bocek immediately after the ACC purchase was completed; and (4) JGA or Amato holding the note for the purchase price and Bocek repaying with the proceeds of the allergy practice, with the expectation that Bocek could re-finance with an institutional lender and pay off the loan within 18-24 months.  The ultimate transfer of ACC from JGA to Bocek was the whole point of the ACC transaction, and the various ways contemplated by the parties to accomplish that transfer have widely varying costs and consequences.  Under

14

these circumstances, it is difficult to describe the structure and terms of that transfer as anything but essential to the purported contract. And because the transfer from JGA to Bocek is an essential term, an agreement to agree in the future is not sufficient. See Allen v. Aetna Cas. & Sur. Co., 281 S.E.2d 818, 819 (Va. 1981) (per curiam) ("[A]n agreement to make a settlement, without specifying more, constitutes only an agreement to negotiate at a later date."); 1 Williston on Contracts § 4:29 (4th ed.) ("[I]f an essential element is reserved for the future agreement of both parties, as a general rule, the promise can give rise to no legal obligation until such future agreement.").

The parties "must assent to the same thing in the same sense, and their minds must meet as to all the terms," and those terms "must be sufficiently definite to enable a court to give it an exact meaning, and must obligate the contracting parties to matters definitely ascertained or ascertainable." Smith v. Farrell, 98 S.E.2d 3, 7 (Va. 1957); see Restatement (Second) of Contracts § 33(2) (contract terms must be certain enough to provide "a basis for determining the existence of a breach and for giving an appropriate remedy"). In this case, the parties never agreed on the structure of the transfer from JGA to Bocek, an essential part of the deal, and the Straw Purchase Agreement is therefore not enforceable. See R. K. Chevrolet, Inc. v.

15

Hayden, 480 S.E.2d 477, 480 (Va. 1997) ("A contract will be enforced if its obligations are reasonably certain."). And because the Straw Purchase Agreement is now the sole basis for Bocek's breach of contract claim, the district court properly granted summary judgment in favor of the defendants on that count.

B.

We turn next to the breach of fiduciary duty claim. In his Amended Complaint, Bocek alleged that Amato and JGA, as his agents, owed him various fiduciary duties, including a duty of loyalty. Bocek alleged that he brought the ACC business opportunity to JGA during the existence of the agency relation, and that JGA was acting on behalf of Bocek when it began negotiating with the Estate and conducting due diligence. Bocek alleged that the defendants breached their fiduciary duties by, inter alia, using information obtained on Bocek's behalf to pursue the acquisition of ACC for themselves, refusing to return the due diligence materials to him, and, of course, buying ACC for their own benefit rather than for Bocek's benefit.

The evidence in the record is more than sufficient, for summary-judgment purposes, to support the factual allegations outlined above, and there is little question that, under the general law of agency, the conduct Bocek alleges is a clear breach of fiduciary duty. Agents are fiduciaries and owe their

16

principals a strict duty of loyalty.  See Restatement (Third) of Agency § 8.01 ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship.").  An agent breaches his fiduciary duties by purchasing for himself property that he was to purchase for his principal.  See Rowland v. Kable, 6 S.E.2d 633, 642 (Va. 1940) ("One who is entrusted with the business of another cannot be allowed to make that business an object of interest to himself. . . . The rule applies alike to agents, partners, guardians, executors and administrators . . . ."); Horne v. Holley, 188 S.E. 169, 172 (Va. 1936) ("It is well settled that where one person sustains a fiduciary relation to another he cannot acquire an interest in the subject matter of the relationship adverse to such other party.").  An agent likewise breaches his fiduciary duty by using confidential information belonging to the principal for the agent's own benefit.  See Restatement (Third) of Agency § 8.05(2) ("An agent has a duty . . . not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party.").

The district court nonetheless granted summary judgment for the defendants, concluding that Bocek could seek recovery for those breaches of fiduciary duty only through a breach of contract cause of action.  Noting that a claim for breach of fiduciary duty can sound in contract or tort, see Augusta Mut.

17

Ins. Co. v. Mason, 645 S.E.2d 290, 293 (Va. 2007), the district court held that the fiduciary duties at issue in this case arose from the Consulting Agreement, not independently of it. The court therefore concluded that "the recovery in tort Dr. Bocek seeks is proscribed as a matter of law," J.A. 1204, and that the defendants were entitled to summary judgment on Count II. See Augusta Mutual, 645 S.E.2d at 293 (where single act can support a claim for breach of contract and a claim breach of a duty arising in tort, "in order to recover in tort, the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract" (internal quotation marks omitted)); see also Station #2, LLC v. Lynch, 695 S.E.2d 537, 540 (Va. 2010) ("[A]n omission or non-performance of a duty may sound both in contract and in tort, but only where the omission or non-performance of the contractual duty also violates a common law duty.").

Many of Bocek's challenges to this ruling are unpersuasive, as they appear to rest on a misapprehension of the principles underlying the legal rule applied in Augusta Mutual. Nevertheless, we find ourselves in agreement with Bocek that the timing of the breach of duty in this case makes the rule inapplicable.

As the decision in Augusta Mutual demonstrates, Virginia courts vigilantly police the border between tort and contract

18

law so as "[t]o avoid turning every breach of contract into a tort." Augusta Mutual, 645 S.E.2d at 293. Nonetheless, recovery in tort is permitted in cases where the tort was committed after the termination of the parties' contract. See Condominium Servs., Inc. v. First Owners' Ass'n, 709 S.E.2d 163, 171 (Va. 2011) (rejecting defendant's assertion that plaintiff could not proceed on tort claim and breach of contract claim: "Because the Management Agreement had terminated [when the tort was committed], CSI's alleged acts did constitute the independent, willful tort of conversion, separate from the contract." (internal quotation marks omitted)); cf. Today Homes, Inc. v. Williams, 634 S.E.2d 737, 744 (Va. 2006) (agent's liability for breach of fiduciary duty continues after termination of the agency relationship only for "transactions completed after termination of the officer's association with the corporation, but which began during the existence of the relationship or that were founded on information gained during the relationship" (internal quotation marks omitted)).

The agency relation terminated on February 27, 2011, ten days after Amato gave Bocek the notice required under the Consulting Agreement, well before the breaches of fiduciary duty alleged in this case. Because the contractual relationship ended before the torts were committed, Bocek's breach of fiduciary duty claims are therefore independent of the

19

Consulting Agreement, and Bocek is entitled to proceed on and recover for those claims in tort.[4] See Condominium Servs., 709 S.E.2d at 171. Accordingly, the district court erred by granting summary judgment against the breach of fiduciary duty claim asserted in Count II of the amended complaint.

C.

We turn now to Bocek's fraudulent conveyance claim. Under Virginia law,

> [e]very gift, conveyance, assignment or transfer of . . . any estate, real or personal, . . . with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void.

Va. Code Ann. § 55-80. The district court granted summary judgment against the claim because Bocek could not show a conveyance of ACC assets by JGA:

> Plaintiff cannot establish the existence of a conveyance by JGA because JGA never owned [ACC's] assets to convey them. [ACC] did not bind itself when it executed the Letter of Intent with JGA, nor did JGA bind itself to acquire the assets. The Letter of Intent served to permit JGA or its assigns to purchase [ACC's] assets. In the end, A2 purchased the assets

---

[4] Our determination that Bocek waived his right to proceed on any breach of contract based on the Consulting Agreement has no bearing on the breach of fiduciary duty claim. Bocek's failure to argue on appeal that the defendants breached the Consulting Agreement amounted to a waiver of that claim, but it cannot be viewed as a waiver of facts alleged in the complaint and separate theories argued below and pursued on appeal.

of [ACC] directly from the Estate. JGA never acquired [ACC's] assets, and therefore JGA never had any legal right or entitlement to those assets. Having no legal interest in [ACC], JGA could not legally have conveyed or assigned any rights to the assets of [ACC].

J.A. 1200.

As Bocek points out, however, his fraudulent conveyance claim is not based on JGA's conveyance of ACC's assets to A2, but on JGA's conveyance of its right to purchase ACC's assets. See J.A. 49, ¶¶ 253-54. While the district court's focus on ownership rather than the right to purchase was arguably erroneous in light of the allegations in the Amended Complaint, we find no error in the court's ultimate disposition of Bocek's fraudulent conveyance claim.

The purpose of the fraudulent conveyance statute is to protect creditors from a debtor's efforts to shield his property from being used to satisfy his debts. See Buchanan v. Buchanan, 585 S.E.2d 533, 535 (Va. 2003) ("The essence of fraudulent conveyance . . . is the diminution of the debtor's estate to the detriment of the creditor's right of realization." (internal quotation marks omitted)). As Bocek recognizes, see Brief of Appellant at 26 n.7, a conveyance diminishes the debtor's estate and works to the detriment of creditors, however, only if the property conveyed has value. See, e.g., 37 Am. Jur. 2d, Fraudulent Conveyances & Transfers § 72 ("If nothing of value is transferred when property is transferred . . . ., then there is

21

nothing to avoid and recover and no fraudulent conveyance."); 37 C.J.S. Fraudulent Conveyances § 9 ("A transfer of property of little or no value will generally not be treated as fraudulent as against creditors. . . ."); see also Balzer & Assocs., Inc. v. The Lakes on 360, Inc., 463 S.E.2d 453, 456 (Va. 1995) (allowing fraudulent conveyance claim to proceed where creditor's evidence "support[ed] the reasonable inference of the property having value at or above the established level of the encumbrances upon it").  In this case, however, there simply is no evidence in the record showing that the property conveyed had value.

The JGA-to-A2 assignment is the only relevant conveyance, and the property conveyed by that assignment was, in Bocek's words, JGA's "right to acquire ACC."  Brief of Appellant at 26. At the time of the assignment,[5] however, the only rights JGA had were those arising under the LOI accepted by the Estate.  And as previously noted, the LOI was not binding – neither JGA nor the Estate had any obligation under the LOI to proceed with the sale unless and until they agreed on the terms of the asset purchase agreement.  The LOI, therefore, was nothing more than an

_____

[5] The precise date of the assignment cannot be determined from the record.  Nonetheless, because the asset purchase agreement required by the LOI was executed by A2 rather than JGA, the assignment must have taken place sometime before the purchase agreement was signed on May 13, 2011.

22

unenforceable agreement to negotiate, see Allen, 281 S.E.2d at 819, not an option contract, as Bocek insists. See, e.g., Hart v. Hart, 544 S.E.2d 366, 373 (Va. 2001) ("An option is merely a continuing offer to sell, irrevocable during the option period." (internal quotation marks omitted)).[6]

Because the LOI was not binding and enforceable, it gave JGA no enforceable rights to purchase ACC. And because Bocek can point to no evidence showing that these unenforceable rights had value, the district court properly rejected the fraudulent conveyance claim.

D.

Finally, we turn to the joint venture claim. "A joint venture is established by contract, express or implied, where two or more persons jointly undertake a specific business enterprise for profit, with each to share in the profits or losses and each to have a voice in the control and management." Ortiz v. Barrett, 278 S.E.2d 833, 840 (Va. 1981). "Coadventurers stand in a fiduciary relation to each other, and within the scope of the enterprise they are bound by the same standards of good conduct and square dealing as are required

---

[6] To the extent that Bocek argues that the Pennsylvania court's approval of the sale gave value to JGA's right to buy ACC, the court approval came after JGA assigned its interests to A2. There simply is no evidence showing that JGA's "right" had value when assigned.

between partners." Jones v. Galleher & Co., 47 S.E.2d 333, 337 (Va. 1948).

Bocek argues (in the alternative to Counts II and III) that if no principal-agent relationship existed between him and Amato (through JGA), then the relationship was one of joint venturers, and that the defendants' acquisition of ACC for their own benefit violated the fiduciary duties they owed Bocek. We disagree. As we have previously discussed, the parties never reached agreement on how the transfer of ACC's assets from JGA to Bocek would be structured, and there simply is no evidence showing that Bocek and Amato ever reached an agreement to operate the ACC offices together, with each sharing in the profits and having a say in management and control of the business. See Ortiz, 278 S.E.2d at 840. The district court therefore properly granted summary judgment in favor of the defendants on the joint venture claim.

## III.

Accordingly, for the foregoing reasons, we hereby affirm the district court's grant of summary judgment in favor of the defendants on Bocek's breach of contract, fraudulent conveyance, and joint venture claims. We reverse the grant of summary

24

judgment on the claim for breach of fiduciary duty and remand for further proceedings on that claim.

<u>AFFIRMED IN PART,</u>
<u>REVERSED IN PART,</u>
<u>AND REMANDED</u>

NIEMEYER, Circuit Judge, concurring in part and concurring in the judgment:

I would allow the breach of fiduciary claim to proceed to trial, and therefore I concur in the result reached in Part II(B) of Chief Judge Traxler's opinion. My reasoning for doing so, however, differs somewhat from that relied on by Judge Traxler.

Bocek retained JGA Associates as his agent to assist him in forming a new medical practice or in rendering other services, as the parties agreed. Pursuant to their "Consulting Agreement," JGA became actively involved in Bocek's effort to purchase an existing medical practice that he had learned was for sale, Allergy Care Centers, and JGA's services thereafter related solely to purchasing Allergy Care Centers. JGA was paid for these services as provided in the Consulting Agreement.

During the course of providing services to Bocek in connection with the purchase of Allergy Care Centers, JGA wrongfully began planning to acquire Allergy Care Centers for itself, and to that end, it terminated the Consulting Agreement with Bocek and thereafter, through an affiliated entity, acquired Allergy Care Centers.

In my judgment, these facts, if ultimately proved, give rise to a classic claim for breach of the duty of loyalty inherent in the agency agreement that existed between Bocek and

26

JGA.  See Restatement (Third) of Agency § 8.01.  An agent clearly breaches this duty of loyalty by purchasing for itself property that it was purchasing for its principal.  See, e.g., Rowland v. Kable, 6 S.E.2d 633, 642 (Va. 1940); Horne v. Holley, 188 S.E. 169, 172 (Va. 1936).

The fact that JGA terminated the agency agreement before taking advantage of the opportunity that came to it while it was an agent provides no defense.  The viable claim remains that JGA came upon the opportunity to purchase Allergy Care Centers during the course of its work for Bocek in assisting him to purchase that practice and, in order to seize that opportunity for itself, terminated the agency relationship.  The law would be a buffoon if it allowed JGA to take Bocek's opportunity simply by ending the agency relationship and proceeding thereafter in furtherance of its own interest.

It is well-established that various duties survive contracts even after the contracts have ended.  Surely, an attorney could not breach a duty of loyalty or confidentiality to a client after the lawyer had completed his service to the client.  See Reese v. Va. Int'l Terminals, Inc., 894 F. Supp. 2d 665, 671 (E.D. Va. 2012) (explaining that Rule 1.9 of the Virginia Rules of Professional Conduct governs a lawyer's duty of loyalty to former clients).  Similarly, an agent's fiduciary obligations do not disappear when the agency relationship ends.

27

See, e.g., Today Homes, Inc. v. Williams, 634 S.E.2d 737, 744 (Va. 2006) (stating that fiduciary obligations continue "after termination of the officer's association with the corporation" for transactions that "began during the existence of the relationship or that were founded on information gained during the relationship" (internal quotation marks omitted)).

I therefore join in the judgment to reverse the dismissal of the breach of fiduciary duty claim and to remand that claim for trial on the merits.  I also concur in the other portions of Chief Judge Traxler's opinion, as well as the judgment.

28

WILKINSON, Circuit Judge, concurring and dissenting:

Breach of contract is not a tort. Virginia law makes clear that a plaintiff may not recover in tort for breach of a duty that exists solely by virtue of a contract. See Augusta Mut. Ins. Co. v. Mason, 645 S.E.2d 290, 293 (Va. 2007). Here, appellant Petr Bocek entered into a contract (the "Consulting Agreement") with appellee JGA Associates ("JGA"). Under that agreement, JGA's president, appellee Joseph Amato, agreed to provide Bocek with business consulting services in connection with the development and purchase of an allergy care practice.[1] The relationship between Bocek and Amato later soured, and Bocek commenced this litigation alleging, inter alia, that Amato breached his fiduciary duty by misappropriating a confidential business opportunity that he learned about from Bocek in the course of the consulting relationship. However, because Amato's duty to Bocek arose solely from the Consulting Agreement, I cannot conclude that Bocek is entitled to recover in tort for the alleged breach. And because Bocek has expressly argued on appeal that Amato's actions did not violate the Consulting

---

[1] Since Amato is the only relevant officer of JGA for purposes of this appeal, I shall use "Amato" to refer to appellees Amato and JGA collectively.

29

Agreement, I cannot conclude that Bocek is entitled to recover for breach of contract. I therefore respectfully dissent.[2]

## I.

As the lead opinion acknowledges, a plaintiff may not recover in tort for breach of a duty that arises solely from a contract. See Augusta, 645 S.E.2d at 293; see also Lead Op. at 18. The aim of this general rule is "[t]o avoid turning every breach of contract into a tort." Augusta, 645 S.E.2d at 293. Here, the duty that Amato allegedly breached arose solely from the Consulting Agreement, thus barring recovery in tort.

## A.

The gravamen of Bocek's tort claim is that Amato "breached his fiduciary duties to Bocek by lying to Bocek about the contemplated purchase price of ACC's assets," "failing to inform Bocek about material aspects of his dealings with [ACC]," and "using to [his own] advantage information [he] gained from Bocek in the course of [the] agency by pursuing ACC's assets for [his] own financial gain." J.A. 51-52. However, as a review of the Consulting Agreement reveals, these allegations actually speak to a breach of two contractual duties imposed on Amato.

---

[2] I concur in the lead opinion's disposition of Bocek's other claims.

30

Pursuant to that contract, Amato agreed to "make a diligent effort to review and report on the feasibility of the proposed allergy medicine practice" and "render such other services as may be agreed upon by the Client and the Consultant from time to time." J.A. 64. As relevant here, the Consulting Agreement imposed two specific duties on Amato: (1) a duty to "update [Bocek] on an ongoing and regular basis as to the [Amato's] progress in fulfilling [his] obligations and performing the services contemplated"; and (2) a duty to "not use any of [Bocek's] [i]nformation for [Amato's] own account." J.A. 64–65. But for the Consulting Agreement, the two parties would not have had any relationship whatsoever and, thus, Amato would not have had the two aforementioned duties to Bocek.

Notwithstanding Bocek's labeling of his tort claim as such, the duties Amato allegedly breached arose solely by virtue of the contract, and any recovery by Bocek for Amato's actions is therefore limited to a contract claim. See Augusta, 645 S.E.2d at 293. While tort law exists to "provide[] redress . . . for the violation of certain common law and statutory duties involving the safety of persons and property, which are imposed to protect the broad interests of society," Filak v. George, 594 S.E.2d 610, 613 (Va. 2004), those "broad interests of society" are not at issue here because Amato and Bocek came together ex

31

_ante_ and bargained for certain terms that were to govern their relationship.

The lead opinion argues that although Amato had a contractual duty not to profit from Bocek's information while the Consulting Agreement was still in effect, that duty terminated with the contract. However, given Amato's ability to unilaterally abrogate the Consulting Agreement while providing only 10 days notice, this contractual duty to refrain from misusing Bocek's information survived the termination. Under Virginia law, a contract must be given a construction consistent with "the intention of the parties as disclosed by the instrument in light of the surrounding circumstances." Columbia Realty Venture, LLC v. Dong Dang, 83 Va. Cir. 258, 261 (2011) (quoting Kirschbaum v. Blair, 34 S.E. 895, 897 (Va. 1900)). Although the Consulting Agreement does not explicitly indicate that Amato's duty not to profit from Bocek's information survived the contract's termination, the parties plainly intended such survival. Consider the consequences of the contrary conclusion. If Amato's duty terminated with the contract, he would have been able to obtain valuable, confidential information from his unsuspecting client and then use that information to his own advantage whenever he chose to do so. Such a scheme would eviscerate the very contract

provision barring Amato from using his client's information in the first place.

The sole case that the lead opinion cites in its support, Condominium Services Inc. v. First Owners' Ass'n, 709 S.E.2d 163 (Va. 2011), only underscores the difficulty with its position. The test used by the Virginia Supreme Court for the tort of conversion requires that "the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract." Id. at 171 (internal quotation marks omitted). See also Restatement (Second) of Torts § 222A ("Conversion is an intentional exercise of dominion or control over a chattel" of another). The conversion in that case existed irrespective of contract. It arose from the freestanding duty of any citizen to respect the lawful property rights of another. Here, as discussed above, the breach of duty was one both established and stemming exclusively from the contract. Unlike in Condominium Services, in this case, there was no "independent, willful tort . . . separate from the contract." Id. (internal quotation marks omitted).

Finally, the lead opinion holds that Bocek can advance his breach of fiduciary duty claims in tort because Amato terminated the Consulting Agreement "well before the breaches of fiduciary duty alleged in this case." Lead Op. at 19. As noted above, it is my view that the contract's requirement that Amato not profit

33

from information provided by Bocek survived the termination. Furthermore, the lead opinion acknowledges that Amato had begun, before he terminated the contract, to use information he acquired from Bocek to contemplate the sale of ACC for his own gain and that of his associates. See Lead Op. 8-9; J.A. 1021-22. Although Amato did not purchase ACC until after the contract was terminated, Bocek provided him with important information while the parties were under contract. Cf. Today Homes, Inc. v. Williams, 634 S.E.2d 737, 744 (Va. 2006) ("Liability post-termination continues only for those transactions completed after termination of the officer's association with the corporation, but which . . . were founded on information gained during the relationship" (internal quotation marks omitted)). Amato's breach of fiduciary duty arose from information gained during and as a result of the contract. Bocek's remedy should lie in contract.

## II.

The parties' sole relationship arose from the contract. The contract set the framework of that relationship. The contract established the duties these parties owed to one another. The contract afforded Amato the access to information he misused. The alleged wrongdoing is only wrong because it stemmed from that contractual understanding. Bocek cannot circumvent the

34

origins of the relationship by declining to argue the relevant contract claim on appeal and opting instead to press what may seem a more lucrative claim and more open-ended recovery in tort. This blurs the line Virginia law has long labored to maintain. I would affirm <u>in toto</u> and respectfully dissent.[3]

---

[3] Inasmuch as there is no single majority approach, I have confined this dissent to Chief Judge Traxler's lead opinion. As to my friend's concurring opinion, to the extent that it can be read to advocate a free standing agency-based breach of fiduciary duty tort to every contract violation, that view is of further distance than the Chief Judge's asserted temporal limitation from my own.